# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS
## Washington, DC

## UNITED STATES

### v.

## Brent H. OLEAN
### Food Service Specialist Second Class (E-5), U.S. Coast Guard

## CGCMG 0147

## Docket No. 1107

## 6 November 2001

General Court-Martial convened by Commander, Maintenance and Logistics Command Atlantic. Tried at Norfolk, Virginia on 13 and14 April and on 27 April to 4 May 1998.

| | |
|---|---|
| Judge: | CAPT Robert W. Bruce, USCG |
| Trial Counsel: | CDR Greg Shelton, USCG |
| Assistant Trial Counsel: | LT Andrew J. Norris, USCG |
| Detailed Defense Counsel: | LT Damian Flatt, JAGC, USNR |
| Assistant Defense Counsel: | LT Anthony Mazzeo, JAGC, USN |
| Appellate Defense Counsel: | LT Sandra K. Selman, USCG |
| | LCDR Jeffrey C. Good, USCG |
| Appellate Government Counsel: | LCDR Chris P. Reilly, USCG |
| | LT Sandra J. Miracle, USCGR |

### BEFORE
### PANEL EIGHT
### BAUM, CASSELS, AND PALMER
Appellate Judges

CASSELS, Judge:

Appellant was tried by a general court-martial composed of officer and enlisted members. Contrary to his pleas, he was convicted of the following offenses: maltreatment of SN F (Specification 2 of Charge I); maltreatment of SN S (Specification 3 of Charge I); making a false official statement (sole specification under Charge II); sodomy with SN F (sole specification under Charge III); adultery with SN F (sole specification under Charge IV); and failure to obey a lawful general order by sexually harassing SN F (sole specification under Additional Charge); in violation of Articles 93, 107, 125, 134, and 92 of the Uniform Code of Military Justice (UCMJ), respectively. Appellant was sentenced to reduction to pay grade E-1, confinement for six months, and a bad-conduct discharge. The convening authority approved the sentence as adjudged.

Before this Court, Appellant has assigned three errors: (1) that he was prejudiced by the admission of uncharged misconduct in the form of testimony about Appellant's alleged domestic violence and his assault on a subordinate; (2) that he was prejudiced by the exclusion of evidence of vengeful statements made by SN F, the principal Government witness, that she intended to "take down" Appellant; and (3) that the evidence is factually insufficient to support findings of guilt as to the five charges resting in whole or significant part on SN F's testimony (maltreatment of SN F, making a false official statement, sodomy, adultery, and sexual harassment in violation of a lawful general order). This third assignment of error was brought on behalf of Appellant under *United States v. Grostefon*, 12 M.J. 431 (CMA 1982).

We reject Appellant's first assignment of error. The judge did not err in admitting the victim witnesses' testimony that they were aware of allegations of Appellant's domestic violence and assault on a subordinate. We also reject the third assignment of error without further discussion, as we find the evidence sufficient to sustain the convictions. However, with regard to the second assignment of error, we hold that the judge did err in excluding evidence of SN F's vengeful statements toward Appellant. We hold that this error was not harmless, and we set aside the findings of guilty for those specifications affected by this error and order a rehearing.

Background

Appellant, a married man, reported to Group Eastern Shore, Virginia, in July of 1996, where he assumed duties as the Food Service Officer in charge of the Group galley. In November 1996, prior to the allegations that were the subject of Appellant's court-martial, Appellant sprayed a can of chemical irritant onto the head and neck of Petty Officer (PO) Grijalva, Appellant's subordinate, in Appellant's garage. At the time, PO Grijalva was present at Appellant's home in response to Appellant's wife's request for assistance in keeping Appellant, who was drunk and disorderly and behaving in a violent manner, out of the house. As a result, in December 1996, Appellant's commanding officer imposed non-judicial punishment on Appellant for being drunk and disorderly. The punishment included reduction to pay grade E-5. He was also relieved of his duties as the Food Service Officer, but remained in the galley as the leading petty officer.

SN S, the alleged victim of one of the maltreatment specifications, was also stationed at Group Eastern Shore. She served in the galley as a mess cook during portions of 1996 and 1997, including the period from December 1996 to April 1997. As mess cook, she assisted the duty cook and was Appellant's subordinate. At trial, SN S testified that when she returned to work in the galley in December 1996 she was aware of Appellant's nonjudicial punishment and the misconduct for which it was imposed, and that it related to a domestic dispute that Appellant had had with his wife. SN S testified that she had also heard of allegations of other domestic violence involving Appellant and his wife. SN S testified as to Appellant's comments alleged in the one specification[1] of maltreatment directed towards herself, and the effect those comments

---

[1] Specification 3, Charge I, Article 93, UCMJ: "In that [Appellant] . . . did . . . on divers occasions between on or about December 1996 and on or about April 1997, maltreat [SN S], a person subject to his orders, by stating to and about her words to the effect of 'I hate her', 'who made you the bitch in charge', 'you'll never see "A" school', 'I need to find a way to book you', 'I've planted marijuana in your car', 'you'll never go to the ANT Team, you're

had on her.  SN S also provided testimony regarding comments she overheard Appellant make to SN F, which are the subject of the other maltreatment specification[2] of which Appellant was convicted.

SN F reported to Group Eastern Shore in August 1995.  She was a Food Service Specialist Third Class (E-4) at the time she reported aboard, and served as a duty cook in the Group galley.  She began working for Appellant after he became Food Service Officer at the Group in August 1996.  SN F departed on maternity leave in November 1996, and returned to full duty in February 1997.  She had had performance problems which were raised at trial by the defense to show, among other things, that SN F's career in the Coast Guard was already beyond salvaging.  The purpose was to show that SN F's testimony in support of the maltreatment allegation, to the effect that she endured mental pain and suffering from Appellant's comments threatening her career, was unrealistic and not credible.  SN F's severe performance problems led to the following adverse administrative actions by Group Eastern Shore: failure to earn the Group's recommendation for advancement; placement on six month's performance probation in May 1996; non-judicial punishment in May 1996 which resulted in her being reduced in pay grade to E-3 in September 1996 when the suspended bust was vacated; the Group's December 1996 request for authority to discharge her, which was denied; the Group's December 1996 extension of her performance probation for an additional three months after she returned from maternity leave; the Group's recommendation in May 1997 that she not be reenlisted; and removal of her "FS" designator in June 1997.  She was discharged from the Coast Guard in September 1997.  Some of these actions led to, and pertain to the relevance of SN F's "take down" threat at issue in the second assignment of error.

On 5 March 1997 SN F accompanied Appellant to a "food show" in Virginia Beach, Virginia, approximately two hours' drive from the Group, and they stayed overnight there in a single motel room.  SN F testified that Appellant forced her to have sexual intercourse and oral sex with him that night in the motel room; and that he made threatening comments to her that were the subject of specification 1 of Charge I (maltreatment), a specification for which the members found Appellant not guilty.  SN F testified that she told Appellant "no" prior to the first act of intercourse, but that she did not resist him further because she feared Appellant, based on her knowledge of his assault on PO Grijalva and alleged acts of domestic violence.  She also testified that she wanted to remain in the Coast Guard and feared that Appellant might make it difficult if she resisted.  SN F testified that she suffered through further threatening comments by Appellant on or about 17 March 1997 after they returned from the food show.  These comments were the subject of the maltreatment allegation in specification 2 of Charge I.[3]  Some of the comments were overheard by SN S, as mentioned above.  After SN F reported the allegations of misconduct, Appellant was interviewed by agents of the Coast Guard Investigative Service.  He

---

going to be stuck here in this hell with me if I have anything to do with it', and 'if one puts visine into coffee grounds and someone drinks the coffee and smokes a cigarette at the same time, it will kill them.'"

[2] Specification 2, Charge I, Article 93, UCMJ: "In that [Appellant] . . . did . . . on or about 17 March 1997, maltreat [SN F], a person subject to his orders, by stating words to the effect of 'Still scared? Good!', 'you want those crows back, don't you?', and 'you'll keep your mouth shut or I'll have you kicked out of the Coast Guard', all with the intent of frightening [SN F] so that she would not report the sexual intercourse and oral sex that occurred on or about 5 March 1997."

[3] *See supra* note 2.

denied SN F's version of events, and accused her of being intoxicated and initiating oral sex on him while he was asleep.

I.

In his first assignment of error, Appellant contends that the judge erred to his substantial prejudice by improperly admitting, over defense counsel's objection, MRE 404(b) propensity evidence of Appellant's alleged domestic violence and his assault on a subordinate. Specifically, SN S, the alleged victim in one maltreatment specification, testified that PO Grijalva and a corpsman had told her that Appellant had sprayed mace in PO Grijalva's face, and that it had to do with a domestic dispute that Appellant had with his wife. R. at 738-39. This event is referred to hereafter as the macing incident. SN S also testified that she had heard of other incidents of domestic violence involving Appellant and his wife. R. at 739. SN F, the alleged victim in two other maltreatment specifications, and in the sexual harassment specification, testified that she knew of the macing incident and that the incident was related to accusations of domestic abuse by Appellant toward his wife. R. at 829.

The judge first addressed the admissibility of this testimony in response to a pretrial motion *in limine* submitted by trial defense counsel. R. at Appellate Ex. XIII. In that motion, defense counsel contended that the macing incident and the allegations of domestic violence with Appellant's wife were specific instances of uncharged misconduct which were inadmissible under MRE 404(b) and MRE 403. The judge initially granted the motion *in limine* as it applied to the expected testimony regarding allegations of domestic violence, and denied the motion as it related to the expected testimony regarding the macing incident. Later, trial counsel requested the judge to reconsider the portion of his earlier ruling which granted the defense counsel's motion *in limine* regarding the allegations of domestic violence. After hearing testimony from SN F and SN S in an Article 39(a) session, the judge changed his ruling, allowing admission of evidence of the victim-witnesses' knowledge of both the macing incident and the allegations of domestic abuse with Appellant's wife.

Appellate counsel both urge this Court to review the military judge's evidentiary ruling using an abuse of discretion standard, citing as authority opinions of our higher Court where that Court stated its own standard of review for trial judge rulings on the admissibility of evidence under MRE 404(b). We do not feel bound by that restrictive standard of review. In *United States v. Cole*, 31 M.J. 270 (CMA 1990), our higher Court held that Article 66(c), UCMJ, authorizes Courts of Criminal Appeals to apply *de novo* review, and stated the following:

> The Government contends that the Air Force Court of Military Review "substituted its own judgment for that of the military judge rather than determining whether his ruling was an abuse of discretion." This argument misunderstands the role Congress intended a Court of Military Review [now Court of Criminal Appeals] to play in the military justice system.

> Article 66(c) establishes the standard of review. Therein, Congress provided:

In a case referred to it, the Court of Military Review may act only with respect to the findings and sentence as approved by the convening authority. It may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law *and fact* and *determines, on the basis of the entire record, should be approved*. In considering the record, *it may weigh the evidence*, judge the credibility of the witnesses, and *determine controverted questions of fact*, recognizing that the trial court saw and heard the witnesses.

This awesome, plenary, *de novo* power of review grants unto the Court of Military Review authority to, indeed, "substitute its judgment" for that of the military judge. It also allows a "substitution of judgment" for that of the court members. In point of fact, Article 66 requires the Court of Military Review to use its judgment to "determine[ ], on the basis of the entire record" which findings and sentence should be approved. This mandate neither stops the Court of Military Review from applying an "abuse of discretion" test nor requires such a test.

*Id.* at 272 (emphasis and omission in original).

In light of the foregoing, we have chosen not to apply the "abuse of discretion" review standard and, instead, have assessed the judge's ruling *de novo*.

To be admissible under MRE 404(b) and MRE 403, evidence of uncharged misconduct must satisfy all three parts of the test set forth by our higher Court in *United States v. Reynolds*, 29 M.J. 105 (CMA 1989). These three parts, as expressed in its subsequent opinion in *United States v. Robles-Ramos*, 47 M.J. 474 (1998) are:

First, the evidence must reasonably tend to prove that the accused committed the uncharged crime, wrong, or act. *United States v. Mirandes-Gonzalez*, 26 M.J. 411 (CMA 1988). "The standard for meeting this factor is quite low." *United States v. Dorsey*, 38 M.J. 244, 246 (CMA 1993). "[T]he task for the military judge is to determine whether there is sufficient evidence for a reasonable court member to believe that the accused in fact committed the extrinsic offense." *Mirandes-Gonzalez*, 26 M.J. at 414.

. . .

Second, the evidence must make some fact of consequence more or less probable. *United States v. Ferguson*, 28 M.J. 104, 108 (CMA 1989); Mil.R.Evid. 401 (definition of relevant evidence) and 402 (relevant evidence admissible; evidence not relevant inadmissible). However, it cannot be offered only as character evidence barred by Mil.R.Evid. 404(a).

. . .

Finally, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. Mil.R.Evid. 403.

*Id.* at 476.

The record clearly shows that the judge applied the appropriate three-part test for admission of uncharged misconduct, referring to elements of that test both in his written ruling, R. at Appellate Ex. LXXXI, and in his statement to counsel explaining his reason for admitting the testimony during the later Article 39(a) session. R. at 666-70, 698-704. His written initial ruling focused on the Government's proposed use of the testimony concerning domestic violence to show Appellant's hostility toward women. For this purpose the judge found the evidence failed part two of the three-part test. The judge realized that hostility toward women, although portrayed by the Government as a motive to maltreat, was also a character trait. As such, the judge reasoned initially that evidence of such hostility offered to prove Appellant later acted with hostility toward a woman was precisely the problematic evidence that MRE 404(b) was designed to exclude. Trial counsel's request to the judge to reconsider this ruling refocused the stated purpose for offering the testimony. This time, trial counsel argued that this testimony was being offered to prove that the victims did experience mental pain or suffering from Appellant's comments and behavior, an element of the maltreatment offenses, and argued that the victims' knowledge of the allegations of domestic abuse was relevant to that element. After hearing the two victim-witnesses testify on the matter in an Article 39(a) session, the judge stated that the evidence was relevant to the victims' state of mind – a non-propensity purpose – and therefore met part two of the *Reynolds* test. The judge then addressed part three of the *Reynolds* test. He expressed concern about the degree of unfair prejudice posed by the evidence, and entered a ruling limiting the nature of the testimony to prevent mention of any details of the domestic violence. With the testimony so limited, the judge ruled that part three of the *Reynolds* test was met. We agree.

The judge also carefully instructed the members, at defense counsel's request, as to the limited purpose of the testimony. His limiting instruction, delivered to the members during the Government's case in chief, is set forth below:

> Now, members, at this point I want to instruct you that certain evidence that you've heard has been admitted for limited purposes, and that's evidence concerning an assault on Petty Officer Grijalva, [and] evidence about reports of alleged domestic abuse . . . . Those items of evidence were introduced for the limited purpose of the effect that those things might have on the state of mind of [SN S] or [SN F] . . . . And also any tendency they may have to show that under all of the circumstances the charged acts of the accused resulted in physical or mental pain and suffering. You may not consider the evidence for any other purpose and you may not conclude or infer from this evidence that the accused is a bad person or has criminal tendencies and that, therefore, he committed the charged offenses. So you should understand that since it's just for the limited purpose of the effect it had on their state of mind, . . . it doesn't even really matter if those ever occurred. All that really matters is if you find that those matters came to the knowledge of the witnesses or the alleged victims, what effect those reports had on their state of mind.

R. at 1039-40.

The judge also included a similar instruction regarding the limited use of uncharged conduct among the other findings instructions. R. at 1299, 1300.

Appellant argues that the judge erred in his application of the third part of the *Reynolds* test. This third part of the test is based on MRE 403. Appellant contends that the relevance of the victims' knowledge of the domestic violence and macing incident was slight. Appellant accurately points out that the victim-witnesses' testimony was weak concerning the impact of the knowledge of this uncharged misconduct. At trial, the Government sought to show that the maltreatment victims suffered two types of mental pain and suffering from Appellant's alleged comments – fear of action adversely affecting their careers by Appellant, and fear of physical assault by Appellant. It is apparent from the record that the victims' fear of assault from Appellant was not their primary concern, but it was a concern. The victims testified at the Article 39(a) session that the hearsay knowledge of Appellant's past violence did contribute somewhat to their mental pain and suffering when Appellant made the alleged comments to them. We also note that fear of assault was apparently an important alternate theory of the prosecution's case for maltreatment of SN F, especially in view of evidence brought out by the defense showing SN F's avowed fear for her career was disingenuous because her career was obviously already doomed by her poor performance even before Appellant's alleged comments were made. We find that the testimony concerning evidence of uncharged misconduct had legitimate probative value, which, with the restrictions placed by the judge upon the scope of this testimony and the limiting instructions he provided, outweighed its unfair prejudice to Appellant.

For the reasons expressed above, we find no error in the judge's ruling admitting the testimony which contained reference to uncharged misconduct.

II.

In his second assignment of error Appellant contends that the judge erred when he excluded evidence of SN F's "take down" threats – i.e., her statements witnessed by two people. One witness recalled in a sworn statement presented at the Article 32 investigation:

> I remember [SN F] specifically telling me that since she was getting kicked out of the Coast Guard she was going to take others down with her – "take them down," were her exact words, and I took it that she was being serious when she said these things. She mentioned specific names including Brent Olean . . . . She states [sic] that they are all out to get her so she should be out to get them, "an eye for an eye," she said.

R. at Appellate Ex. XXIII, Encl (1).

This witness later recalled hearing this statement by SN F sometime after the food show SN F attended, which was on 5-6 March 1997. R. at Appellate Ex. XXIII. The same threat, or one similar, was heard by another person, who recalled in his testimony at the Article 32 investigation as follows: "[SN F] made a general threat along the lines of, 'if they're going to kick me out, I'm going to take anybody I can with me and that includes the galley staff.'" R. at Appellate Ex. XXII, Encl (1). This witness was very uncertain about when SN F made the statement. He recalled that it was around the time "when she first found out she was going to be

7

discharged from the Coast Guard," but it was unclear whether that might be November 1996 when the Group began processing paper to request authority to discharge her, or much later in May 1997 when the Group did not recommend her for reenlistment.

The Government submitted motions *in limine*, requesting the defense be prohibited from eliciting testimony or presenting evidence related to these statements by SN F. R. at Appellate Ex. XXII, XXIII. The judge, in a written ruling, granted the Government's motion. R. at Appellate Ex. LXXXII. The judge found that SN F's statements were "evidence of a motive to fabricate allegations against the accused. But the evidence is not necessarily relevant to the charged allegations, which were made in March 1997." The judge found that the SN F probably made the "take down" statements in or after May 1997, and we accept this finding. Due to this interval of about two months between SN F's accusations against Appellant and her later "take down" threats, the judge reasoned that her "take down" threats were not relevant to the credibility of her earlier accusations: "A motive to fabricate or a vengeful state of mind formed and precipitated by events occurring more than a month after the charged allegations were made, has no relevance to the issue of [SN F's] motive or state of mind when the charged allegations were made." *Id.* The judge also expressed concern that presenting evidence of the "take down" threats would tend to mislead the members and confuse the issues. *Id.*

Appellant contends that the judge erred in his ruling excluding evidence of SN F's "take down" threats. We agree. As explained in that portion of this opinion addressing Appellant's first assignment of error, we are empowered to review this contested ruling *de novo*.

MRE 608(c) provides that "[b]ias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced." Evidence of bias is a potent and effective means of attacking the testimony of a witness. Excluding such evidence presents serious Constitutional confrontation rights issues. *Davis v. Alaska*, 415 U.S. 308 (1974). Evidence of possible bias is at the core of the Confrontation Clause of the Sixth Amendment guarantee. The Supreme Court, in *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), stated:

> The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, "means more than being allowed to confront the witness physically." . . . Indeed, "'[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*.'" Of particular relevance here, "[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

In this case, however, the trial court prohibited *all* inquiry into the possibility that [the prosecution's witness] would be biased as a result of the State's dismissal of his pending public drunkenness charge. By thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause.

*Id.* at 678, 679 (citations omitted).

Our examination of SN F's "take down" threats indicate that they were potentially very damaging to her credibility. These threats showed that SN F harbored ill feelings toward Appellant, specifically. They reveal an intention by SN F to take action that would adversely affect others who in her view were "out to get her," specifically including Appellant, if she was "going to be kicked out." "Kicked out" could refer to either the Group's processing SN F for discharge in November 1996, or the non-recommendation for reenlistment in May 1997. Irrespective of when the statement was made, it evinced a mind-set with an intention to harm Appellant's career, if she was "going to be kicked out" of the Coast Guard. Her threat did not suggest that she would wait until she was "kicked out" to act against those toward whom the threat was directed. Nor did it indicate that her threat would abate after her discharge was effected. Although SN F may not have verbally expressed to these two witnesses her intention to "take others down" until May 1997, the earliest date determined likely by the judge, she may reasonably have harbored this intention before that – from the time she first perceived that the Group was mobilizing to terminate her Coast Guard career. This could well have been the date she was notified that she was being considered for a discharge recommendation (November 1996). These statements were important ammunition for the defense to reveal to the members a possible motive for SN F to misrepresent – both in her testimony at trial and in her initial accusations.

Appellate government counsel contends that Appellant did not precisely raise the issue of the relevance of the "take down" statements to SN F's possible bias in her testimony at trial, and urges us to hold that Appellant waived this argument. We disagree. Our review of the record reveals that, although this aspect of SN F's threat was not the focus of the discussion regarding this motion *in limine* at trial, it was addressed by defense counsel at trial:

[Defense counsel]: Your Honor, the Government places great emphasis on the timing of this statement . . . . Your Honor, defense submits that the statement – the timing of the statement itself is not important to this motion. What matters is that the statement was made. The government concedes for the purposes of this motion that the statement was made. The statement could have been made yesterday and it still has relevance to this court-martial. When the motive arose is a primary concern, not when the statement was made.

[Judge]: Well, the statement seems to be prospective, so if it were made yesterday it would apply to things happening today and thereafter.

[Defense counsel]: Well, *yes, sir, and the court-martial is happening today and hereafter*.

. . .

[Defense counsel]: Your Honor, Military Rule of Evidence 608(c) tells us that bias, prejudice, or any motive to misrepresent may be shown to impeach the witness by examination of the witness or by evidence otherwise adduced. . . .  Any evidence of a motive or bias to misrepresent.  This clearly falls into that category, Your Honor, and *regardless of the timing, it continues to exist as a motive to misrepresent*.

R. at 280-81, 283 (emphasis added).

Defense counsel's answer to the Government's motion *in limine* also addressed the importance of the "take down" statements to SN F's possible bias at the time of trial:

[SN F] clearly knew that she was being considered for discharge from the Coast Guard. *Her statement, irrespective of its timing, is logically relevant to show her motive to misrepresent and her bias against FS2 Olean.  As such, these statements are clearly admissible under M.R.E. 608(c).*  The timing of the statements goes, not to the admissibility of the evidence, but to their [sic] weight.  Further, both statements were shown to have been made in close proximity to the time [SN F] raised allegations against Petty Officer Olean.

R. at Appellate Ex. XXIV (emphasis added).

The word "Further" begins that portion of the defense counsel's argument addressing the relevance of the "take down" statements to SN F's initial allegations.  In his argument immediately preceding that word, defense counsel addressed the separate issue of the relevance of the "take down" statements to SN F's testimony.

We hold that the trial judge erred in granting the Government's motion *in limine* excluding the "take down" statements.  These statements were admissible under MRE 608(c).

Having concluded that the military erred by excluding, over defense objection, admission of statements made by SN F that she intended to "take down" Appellant and others if she was going to be kicked out of the Coast Guard, we must determine whether the error was harmless or prejudicial.  An improper denial of impeachment by bias is subject to the harmless-error analysis set forth by the Supreme Court in *Delaware v. Van Arsdall*, *supra*:

Accordingly, we hold that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* [*v. California*, 386 U.S. 18 (1967),] harmless-error analysis.  The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.  These factors

include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

475 U.S. at 684.

Applying these factors, we conclude that the error was not harmless. SN F's testimony was important to the prosecution's case for all but one of the alleged offenses of which Appellant was convicted. SN F was the only eyewitness testifying regarding the adultery, sodomy, and sexual harassment charges. Her testimony was essential to the false statement charge since her version of Appellant's activities was offered to show that Appellant's version was false. Her testimony was also essential to the one maltreatment allegation of which Appellant was convicted, which alleged Appellant made certain threatening statements to SN F after returning from the food show.

SN F's testimony on those offenses was not cumulative. Although SN S's testimony corroborated some of Appellant's statements alleged in the maltreatment specification, SN F's testimony was necessary to describe the context of the statements and their impact on her in order to establish the elements of maltreatment under Article 93, UCMJ.

Defense counsel devoted most of his argument on findings to convincing the members that SN F's testimony was untruthful. The verdict indicates that the members were, in part, persuaded to defense counsel's view. The members found Appellant not guilty of the maltreatment specification relating to SN F at the food show. This finding indicates that they were not convinced by SN F's testimony of some circumstances relating to Appellant's actions on the night of the food show. However, the findings of guilty on the false statement, sodomy and adultery charges, indicate that the members did believe critical aspects of SN F's testimony regarding the sexual activity on that night, instead of the version of events related by Appellant to the Coast Guard special agent, who testified at trial.

SN F's testimony was subject to considerable cross-examination, which brought to the surface inconsistencies in her testimony, prior inconsistent statements, the unreasonableness of some of her testimony, a prior unfounded allegation of sexual harassment, and performance problems. Defense counsel also attacked her testimony through the testimony of the Group administrative officer and a petty officer that she had a reputation for being untruthful at times; and opinion testimony of two petty officers that she was not truthful; testimony of a petty officer that SN F made a false accusation against her; testimony by a petty officer that SN F lied to him and others about an incident involving SN F that never actually happened; testimony from two witnesses that contradicted portions of SN F's testimony concerning events at the food show; testimony by the investigating special agent that many of SN F's coworkers he spoke to felt she was not trustworthy; and facts judicially noticed that contradicted SN F's testimony concerning the weather conditions at the food show. The judge described in his instructions to the members eight examples of prior statements by SN F that were inconsistent with her testimony in court.

However, the cross-examination of SN F did not clearly raise any issue of her possible bias against Appellant. The absence of this evidence of bias severely handicapped Appellant's defense. As a result of the judge's ruling, defense counsel was left without the ability to offer the members an explanation for why she might lie. Even when a witness is shown to have a poor reputation for trustworthiness, it is natural for a member to want to believe what the witness says in the absence of a particular reason not to believe. It is normal practice to presume that witnesses will ordinarily tell the truth, even if they are untrustworthy, because members feel people are basically honest and because the truth is normally the easier road, especially since the consequences of untruth include prosecution for perjury or false statement.

It is apparent from defense counsel's argument to the members on findings that the absence of evidence of bias handicapped Appellant's case. Defense counsel devoted the majority of his argument on findings to convincing the members that SN F's testimony was untruthful. He reviewed SN F's numerous prior inconsistent statements, opinion and reputation evidence as to her untrustworthiness, and testimony of other witnesses contradicting her version of events. But he was unable to provide the members with a convincing reason that she would lie. His argument speculated on several possible motives for lying, but with no evidence to support the speculation. Defense counsel offered the following speculation regarding SN F's resentment toward others at her command in connection with efforts to discharge her:

> Well, maybe she was telling us these lies, maybe she was telling us the lies because she wanted to take others down with her. And who better, as the prosecution has characterized him, as the first line supervisor, the one who had documented all the bad behavior, or at least drafted it, for [an officer] to sign, the one who after the nonjudicial punishment no one apparently liked, the one who she knew the command would easily sacrifice. Maybe that was why she lied. I don't know. Maybe. And, frankly, this is probably the most likely – maybe she just can't help but to lie.

R. at 1332.

We find that, although the members were presented with other reasons for disbelieving SN F's testimony, the exclusion of SN F's "take down" threats resulted in an incomplete picture of her reasons and motive to lie. This left the members to speculate as to whether she might harbor ill feelings toward Appellant for his role in the circumstances which led to the recommendation to discharge her and the subsequent recommendation to not reenlist her.

We determine that this error materially prejudiced the accused's substantial rights as to those convictions in which SN F's testimony was a substantial factor and her testimony was not well corroborated by other testimony. SN F's testimony played an important role in the Government's case in five of the convictions: Specification 2 of Charge I (maltreatment of SN F); the Specification of Charge II (false official statement); the Specification of Charge III (sodomy with SN F); the Specification of Charge IV (adultery with SN F); and the Specification of the Additional Charge (sexual harassment of SN F). However, we find that SN F's testimony with regard to most of the statements made to her by Appellant which are the subject of Specification 2 of Charge I (maltreatment of SN F) were clearly corroborated by SN S. Accordingly, we will set aside findings of guilty entered as to Charges II, III, IV, and the

Additional Charge, and the specifications thereunder. But, because we conclude that this error did not affect the findings of guilty entered as to Specifications 2 and 3 of Charge I, we will affirm those findings of guilty.

## Conclusion

Appellant's substantial rights were materially prejudiced by the judge's failure to allow testimony that would have given the court members a more complete understanding of SN F's possible motivations in accusing the Appellant of misconduct and her testimony concerning those accusations.

We find that this error did not affect the convictions of Specifications 2 and 3 of Charge I. We have reviewed the record in accordance with Article 66, UCMJ, and have determined that the findings of guilty of Specifications 2 and 3 of Charge I are correct in law and fact, and, on the basis of the entire record, should be approved. Accordingly, those findings of guilty are affirmed.

The findings of guilty of Charges II, III, and IV, and their Specifications, and the Additional Charge and its Specification, along with the sentence, are set aside and a rehearing is ordered. If the convening authority determines that it is impracticable to hold a rehearing on these charges and specifications that have been set aside, he or she may dismiss those offenses and order a rehearing on the sentence alone. If the convening authority determines a rehearing on the sentence alone is impracticable, the convening authority may approve a sentence of no punishment without conducting a rehearing. In any event, upon completion of a rehearing, if any, and a new convening authority's action, the record will be returned to this Court for further review pursuant to Article 66, UCMJ.

BAUM, Chief Judge, and PALMER, Judge, concur.



For the Court,


Kevin G. Ansley
Clerk of the Court