# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39348**

————————————

**UNITED STATES**
*Appellee*

**v.**

**LT[1] MOORE III**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 17 April 2019

————————————

*Military Judge:* L. Martin Powell.

*Approved sentence:* Dishonorable discharge, confinement for 3 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 27 July 2017 by GCM convened at Buckley Air Force Base, Colorado.

*For Appellant:* Major Meghan R. Glines-Barney, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Captain Peter F. Kellett, USAF; Mary Ellen Payne, Esquire.

Before HUYGEN, MINK, and POSCH, *Appellate Military Judges.*

Judge POSCH delivered the opinion of the court, in which Senior Judge HUYGEN and Judge MINK joined.

————————————

**PUBLISHED OPINION OF THE COURT**

————————————

---

[1] Appellant's official records and the record of trial, to include the Personal Data Sheet, show Appellant's given name as "LT" with no middle name or initial.

POSCH, Judge:

A general court-martial composed of a military judge found Appellant guilty, contrary to his pleas, of one specification each of sexual assault by penetrating the vulva of his girlfriend, AC, with his penis and assault consummated by a battery upon AC, in violation of Articles 120 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 928.[2] In addition, Appellant pleaded and was found guilty of one specification of violation of a lawful order in violation of Article 92, UCMJ, 10 U.S.C. § 892.[3] The three offenses involve Appellant's conduct when AC was 16 to 18 years old and spending weekends with him in his on-base dormitory room on Buckley Air Force Base (AFB), Colorado. The military judge sentenced Appellant to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence.

Appellant raises two issues on appeal: (1) whether the military judge abused his discretion by admitting over defense objection evidence of Appellant's uncharged acts that the Government offered pursuant to Mil. R. Evid. 404(b) and (2) whether Appellant's trial defense counsel were ineffective by insufficiently cross-examining AC.[4] Finding no error, we affirm the findings and sentence.

## I. BACKGROUND

Appellant was a 22-year-old technical training student in Texas when he used an Internet dating site to meet 15-year-old AC, who lived with her parents near Buckley AFB, Colorado. A few months later, AC turned 16 and Appellant was reassigned to Buckley AFB where he met AC in person.

AC testified that, between about August 2014 and December 2016, she and Appellant spent "every" weekend together. Appellant picked her up from her parents' house in his car on Fridays and she stayed with Appellant in his on-base dormitory room until Appellant drove her home on Sundays. Her regular

---

[2] Appellant was acquitted of an additional specification of sexual assault (anal penetration) of AC in violation of Article 120, UCMJ. For the charge of assault consummated by a battery, the military judge excepted the language of "on divers occasions" and "arms, legs and torso with his hands," substituting therefor the words "arm with his fist," and found Appellant guilty of the substituted language.

[3] Appellant failed to obey an order given by his first sergeant to not contact AC. The order was given after AC reported the assaults to a United States Marine Corps recruiter who initiated a formal report that was referred to the Air Force to investigate.

[4] Appellant personally asserts this issue. *See United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

weekend visits included watching movies, playing video games, and engaging in sexual acts with Appellant.

A few months into the relationship, Appellant began demonstrating controlling behavior over AC that continued until AC ended the relationship. After an evidentiary hearing to decide the admissibility of Appellant's conduct, the military judge permitted AC and other witnesses to testify about Appellant's acts, concluding they were crimes, wrongs, or other acts admissible under Mil. R. Evid. 404(b). AC testified that Appellant repeatedly called AC by her formal name, which she "told him multiple times" she disliked. AC used an inhaler for her asthma, but Appellant "wouldn't want [her] to use it, even when [she] would need it." As a result, she tried to use it only when Appellant "wasn't in the room." In reference to her personal appearance, Appellant did not want AC to wear her hair up, would take hairbands out of her hair and hide them, and would forcibly twist her arms and legs as she "screamed," cried, and pleaded with him to "stop" when she tried to get them back. These incidents left "bruises from [Appellant's] fingertips . . . digging into [her] skin." AC also testified that Appellant would smack her hand out of her mouth to stop her from biting her nails and it "stung pretty bad when he'd hit [her]." Appellant called her nose ring "trashy." When it went missing, she did not ask him about it because she "knew . . . [Appellant] wouldn't let [her] put it back in" if she had found it.

According to AC, Appellant paid close attention to what AC ate and did not let her drink milk or snack between meals when she was hungry. He was critical of her weight and physique and would often "make fun of" and "poke" her stomach. Appellant "always want[ed her] to work out" when she did not want to exercise and ordered her to live-stream her workout sessions to him to prove that she was exercising when she was not with him. According to AC, Appellant did not want to be seen with her because, as he told her, she "looked 12 [years old]." Appellant did not introduce her to anyone in his dormitory, told her not to answer the door when she was alone in his room, and left AC in his car when he shopped on base "[b]ecause [Appellant] didn't want anyone seeing [AC with Appellant] in the store." Appellant also told AC that, if she were not dating Appellant, no one else would want her.

During the course of their relationship, Appellant engaged in behaviors with AC that limited the quality and quantity of her time spent with her friends. Appellant "didn't want [AC] to be on [her] phone" when they were together and "wouldn't let [her] have [her] phone" when her friends, including male friends, sent her texts or tried to video chat with her. One male friend testified that, during a video call he had with AC as she sat on Appellant's bed, Appellant repeatedly shoved her off the bed to get her "attention." The friend observed that AC "kept telling [Appellant to] stop, but he wouldn't."

Even when Appellant was not with AC, he tried to control her. When AC was visiting the same male friend and the friend's family in Florida, Appellant called her "multiple times," and made her "check in with him . . . every two hours and tell him what [she] was doing, where [she] was, [and] who[m she] was with."[5] When she failed to do that, Appellant became upset and admonished her. Appellant also made AC check in with him every two hours when she visited her grandmother in California. At home in Colorado, between October 2015 and March 2016, AC worked in a restaurant. Appellant did not like her working on weekends and encouraged her to quit her job, which she did, in part, to spend more time with Appellant.

The relationship ended in December 2016. AC and Appellant had fights about her desire to join the United States Marine Corps (USMC). Previously Appellant had threatened to call her USMC recruiter and stop her enlistment. In late December 2016, they were arguing and Appellant told AC, "Let's just have a kid then, so you won't have to leave," knowing that pregnancy would disqualify her from basic training. Appellant proceeded to climb on top of AC, who was lying in bed, and tried to penetrate her vagina with his penis. AC told him "no," pushed Appellant off of her, and "started having a panic attack."[6] About a week later, AC disclosed Appellant's physical and sexual abuse to her recruiter. The recruiter arranged a meeting between AC and USMC officials, who referred AC to the Air Force Office of Special Investigations (AFOSI) at Buckley AFB.

AC told the AFOSI agents about the events that became the basis for Appellant's convictions for assault consummated by a battery and sexual assault.[7] AC described the first incident as occurring in the fall of 2015. She and Appellant were sitting on his bed and watching television when she playfully tapped his arm with her fist. Appellant turned and punched her with his fist with enough force that she fell backwards and had a large welt and bruise on her arm. Appellant told AC "[she] got what [she] deserved." AC reported the second incident as a sexual assault that occurred on Labor Day weekend in September 2016. She and Appellant were sleeping in his bed. Lying on her side and facing away from Appellant, AC awoke to him wrapping his arms around her chest, pulling her tight against him, and repeatedly penetrating her vagina with his penis, despite AC loudly and repeatedly telling him to "stop." During the AFOSI investigation, AC participated in a "pretext" phone call with Appellant.

---

[5] The same male friend recalled the frequency of AC's contact with Appellant differently, testifying she called Appellant "[e]very 30 minutes."

[6] Appellant was not charged with an offense for the December 2016 incident.

[7] AC also reported the sexual assault by anal penetration of which Appellant was acquitted.

Regarding the second incident, Appellant admitted to penetrating AC's vulva with his penis, but Appellant insisted he "wouldn't have [continued] if [he had] heard [AC] say 'stop.'"

AC testified at trial about her relationship with Appellant and explained that, when Appellant told her to do something, she would comply because "things were easier if [she] just did it" and Appellant would "ignore" or "get upset" with her if she said "no." AC stayed in the relationship as long as she did because she had "convinced" herself "that it was fine" and did not report the assaults because Appellant would "[g]et mad" and had told her she "would ruin his life" if she did.

## II. DISCUSSION

### A. Controlling Behavior and Mil. R. Evid. 404

#### 1. Additional Facts

Before trial, the Government provided notice to the Defense that, pursuant to Mil. R. Evid. 404(b)(2), it intended to introduce evidence at trial of Appellant's pattern of uncharged acts to show Appellant's "motive, intent, and plan to dominate and control" AC. The Defense moved to exclude the evidence on the grounds that the uncharged acts would "fall squarely into the realm of propensity" and create the danger that the factfinder would convict Appellant "simply for being a bad boyfriend." The Defense argued that the acts at issue were not admissible under Mil. R. Evid. 404(b) and any probative value was substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403. The Government countered that the evidence demonstrated Appellant's intent to "abuse" and at times "isolate" AC. The Government also argued that the evidence explained how Appellant was "able to carry out the charged offenses," that admission of the evidence was necessary for the Government to "overcome the hurdle of the presumption that a boyfriend would not physically or sexually harm his girlfriend," and that the evidence satisfied the Mil. R. Evid. 403 balancing test. Following an Article 39(a), UCMJ, 10 U.S.C. § 839(a), evidentiary hearing, the military judge denied the defense motion.

Appellant argues the military judge erred when he admitted evidence of Appellant's uncharged acts that the Government offered pursuant to Mil. R. Evid. 404(b) to show Appellant's controlling behavior and prove the two charged sexual assault offenses.[8] We disagree and find no error.

---

[8] The Government offered the evidence of Appellant's acts for all the charged offenses, but the military judge admitted it only for the charged sexual assaults.

### 2. Law

A military judge's ruling under Mil. R. Evid. 404(b) and Mil. R. Evid. 403 will not be disturbed except for a clear abuse of discretion. *United States v. Morrison*, 52 M.J. 117, 122 (C.A.A.F. 1999) (citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act by a person is not admissible as evidence of the person's character in order to show the person acted in conformity with that character on a particular occasion and cannot be used to show predisposition toward crime or criminal character. However, such evidence may be admissible for another purpose, including to show, *inter alia*, motive, intent, plan, absence of mistake, or lack of accident. Mil. R. Evid. 404(b)(2); *United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010) (citation and footnote omitted). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989).

We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b): (1) Does the evidence reasonably support a finding by the factfinder that Appellant committed other crimes, wrongs, or acts? (2) Does the evidence of the other act make a fact of consequence to the instant offense more or less probable? (3) Is the probative value of the evidence of the other act substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403? *United States v. Reynolds*, 29 M.J. 105, 109 (C.A.A.F. 1989). "If the evidence fails to meet any one of these three standards, it is inadmissible." *Id.*

### 3. Analysis

#### a. Evidence of Other Acts

The military judge applied the first *Reynolds* prong—whether the evidence reasonably supports a finding by the factfinder that Appellant committed other acts—and found that AC's testimony "could reasonably support a finding" that Appellant engaged in controlling behaviors, which were the acts at issue. In particular, the military judge determined that, between 2014 and 2016, Appellant and AC were involved in a romantic relationship during which Appellant engaged in conduct that "could be described as controlling behavior." As found by the military judge, Appellant refused to call AC by her preferred name; dictated aspects of AC's personal appearance such as how she should wear her hair, whether she could wear piercings, and what and how AC could eat; made

disparaging comments to AC about her weight; demanded that AC exercise and provide proof of doing so; kept AC isolated from others during their weekends together; told AC that if she were not dating Appellant that no one else would want her; attempted to control with whom AC communicated and spent time, to include telling her not to talk to other males, taking AC's phone from her, and forcing her to end conversations with friends; demanded that AC check in with Appellant on a regular basis when she was out of town and became angry with her when she failed to do so; encouraged AC to quit her job to spend more time with Appellant; and threatened to ruin AC's chances of enlisting in the USMC and attempted to impregnate her to disqualify her.

We find the military judge's factfinding on the first *Reynolds* prong was amply supported by the evidence of record. The military judge found AC's testimony could reasonably support a finding that Appellant committed these acts, as do we; and, we find AC's testimony about specific acts of Appellant's controlling behavior was corroborated in part by testimony from AC's USMC recruiter and AC's friend. Thus, we conclude that the military judge properly applied the first *Reynolds* prong.

### b. Facts of Consequence Made More or Less Probable

The military judge applied the second *Reynolds* prong—whether evidence of the other acts makes a fact of consequence to the instant offense more or less probable—and agreed with the Government that "the evidence of prior uncharged acts consisting of [Appellant's] controlling behavior" could be used for a purpose other than to show criminal propensity. The military judge found the incidents had some relevance to the charged offenses for their tendency to prove Appellant's "motive, intent and lack of mistake or accident with respect to the two charged sexual assault offenses." In short, the evidence of Appellant's controlling behavior made more or less probable two facts of consequence: AC's consent and Appellant's mistake of fact as to AC's consent.

Specifically, the military judge found the incidents relevant to trial counsel's theory that Appellant's "behavior with [AC] evinced a motive and intent to control or dominate [AC], which might make it more probable that he would disregard [AC's] wishes with respect to her willingness to engage in sexual acts on the charged occasions." Additionally, the military judge determined that the evidence of these acts had "some tendency to rebut a suggestion that [Appellant] was unaware that [AC] wanted him to stop during the charged incidents, and that the uncharged acts would tend to offer an alternative explanation for [Appellant] not stopping when requested to do so." The military judge articulated that this alternative explanation was that Appellant "would be willing to

ignore [AC's] wishes when it came to sexual acts, and that [Appellant] would attempt to control her during sexual acts."[9]

We find the military judge correctly applied the second *Reynolds* prong. Two facts of consequence in this litigated case were (1) whether AC consented to anal and vaginal intercourse with Appellant and (2) if not, whether Appellant mistakenly believed that she did.[10] The legal definition of "consent" includes "a *freely given* agreement to the conduct at issue by a competent person." 10 U.S.C. § 920(g)(8)(A) (2016) (emphasis added). "Lack of consent may be inferred *based on the circumstances of the offense. All the surrounding circumstances* are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist *only because of another person's actions*." *Id*. § 920(g)(8)(C) (emphasis added). To refute Appellant's "mistake of fact" defense, the Government had the burden to prove beyond a reasonable doubt that Appellant's ignorance or mistake was neither honest nor reasonable "under all the circumstances."[11] R.C.M. 916(j)(1).

Evidence of Appellant's acts of controlling behavior was probative of these facts of consequence—lack of consent and mistake of fact as to consent. It is clear from AC's testimony that Appellant set expectations for AC and would get angry or abuse her verbally when she did not meet those expectations. It is equally clear that in response, AC would at times comply to appease Appellant "because things were easier" than if she did not. Appellant's controlling behavior demonstrated that he had the motive and intent to repress, instead of respect, her personal autonomy and thus was probative of her lack of consent. His conduct also made it much less probable that Appellant was mistaken that AC consented to the sexual acts when she had not. Consequently, the evidence the Government offered under Mil. R. Evid. 404(b) made the fact that Appellant intended to penetrate AC when she did not consent more probable and Appellant's ignorance or mistake that AC did consent less probable. *See* Mil.

---

[9] The military judge made no finding as to the Government's proffer that Appellant's acts were also admissible both to show a "plan" to dominate and control AC and to overcome an inference that "a boyfriend would not physically or sexually harm his girlfriend."

[10] For both sexual assault allegations, the Government had to prove, *inter alia*, that Appellant caused bodily harm to AC by penetrating her vulva and anus with his penis. *See Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 45.b.(3)(b). "The term 'bodily harm' means any offensive touching of another, however slight, including any *nonconsensual* sexual act . . . ." Article 120, UCMJ, 10 U.S.C. § 920(g)(3) (2016) (emphasis added).

[11] If shown by some evidence, mistake of fact as to consent is a defense to sexual assault. It requires that an accused, because of ignorance or mistake, incorrectly believed that another consented to the sexual act. *See* R.C.M. 916(j)(1).

R. Evid. 401(a); *United States v. Jackson*, 2011 CCA LEXIS 303, at \*17 (A.F. Ct. Crim. App. 15 Aug. 2011) (unpub. op.) (numerous uncharged acts admissible to show appellant's "strong desire to dominate and control women"), *rev. denied*, 71 M.J. 4 (C.A.A.F. 2011) (mem.). Thus, we conclude that the military judge's application of the second *Reynolds* prong to determine that Appellant's controlling behavior demonstrated Appellant's motive, intent, and lack of mistake or accident with respect to the two charged sexual assault offenses was not clearly unreasonable.

### c. Probative Value and Danger of Unfair Prejudice

Applying the third *Reynolds* prong—whether the probative value of the evidence of the other acts was substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403—the military judge found the probative value of the evidence of Appellant's controlling behavior was not substantially outweighed by the danger of unfair prejudice to Appellant under Mil. R. Evid. 403. We agree. First, the military judge explained that the uncharged acts were "not particularly aggravating" so any potential prejudice from their admission was limited. In fact, the uncharged acts were much less serious than the charged acts and most were not criminal in nature. Second, the military judge was confident that, as the factfinder in the judge-alone case, he would use the evidence of Appellant's controlling behavior only for the limited permissible purposes under Mil. R. Evid. 404(b) and not for general bad character or propensity. We are similarly confident. Thus, as to the third *Reynolds* prong, we find the military judge properly applied the Mil. R. Evid. 403 balancing test and the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

We conclude that the military judge properly applied the *Reynolds* test and his ruling to deny the Defense motion to exclude evidence of Appellant's acts was not a clear abuse of discretion. Accordingly, we hold that the military judge did not err in admitting evidence of Appellant's controlling behavior to show Appellant's motive and intent with respect to whether his girlfriend consented to sexual acts with Appellant, and if not, whether Appellant was mistaken and believed that she did.

### B. Ineffective Assistance of Counsel

#### 1. Additional Background

Appellant submitted a declaration in which he asserted that he told his trial defense counsel that it was he, not AC, who "decided to leave" the relationship despite "AC blackmailing [Appellant] into staying." Appellant claimed he told his counsel that AC warned him that she would sabotage the contraception they used and become pregnant to make sure he would "stay in her life" and that AC threatened to commit suicide or make a false police report if

Appellant ended the relationship. Appellant also declared that his counsel were aware of legitimate reasons why Appellant disliked AC's friends and did not want her to spend time with them; specifically, their drug abuse, smoking, racial prejudice, and because, Appellant claims, one friend left AC alone with a stranger who then sexually assaulted her. According to Appellant, had his counsel confronted AC with this information at trial, the Government's theory that his motivation was simply to isolate, dominate, and control AC would have been discounted. Appellant asserts that he "was advised [by trial defense counsel] not to speak during trial [about these issues] even though [his] testimony would have shed some much needed light on the confusing statements that were made."

In response to Appellant's claims, we ordered and received declarations from Appellant's trial defense counsel. Both counsel refute Appellant's contention that he relayed to them that AC had "blackmailed" him or in any way threatened him to remain in the relationship. Both counsel explained they made a decision to not introduce evidence of Appellant's dislike of AC's friends because doing so would not have undermined, and may even have reinforced, the Government's theory of Appellant's motive and intent to control AC. Both counsel explained that they discussed with Appellant his right to testify in his own defense, and his decision not to testify was memorialized by both counsel and Appellant in writing after the Government rested its case.

### 2. Law

The Sixth Amendment to the United States Constitution[12] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). Appellant contends his trial defense counsel were ineffective because they did not impeach AC on cross-examination about her motivation for reporting and fabricating the allegations and about the underlying reasons why Appellant disliked AC spending time with her friends.

In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (citation and footnote omitted), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984) (citations omitted). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). Accordingly, we "will not second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (quoting *United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001)).

We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza,* 67 M.J. at 474). We

---

[12] U.S. CONST. amend. VI.

utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"? (2) If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"? (3) If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result? *Id.* (alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

### 3. Analysis

The record in Appellant's case, to include the declarations, "compellingly demonstrate[s]" the improbability of Appellant's contentions about why his relationship with AC ended and refutes his claim that he was inadequately represented. *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997). AC's recorded pretext phone call to Appellant, which was admitted at trial, made clear that AC, not Appellant, ended the relationship. In that phone call, Appellant asked AC "Why did you leave?" and it is apparent Appellant had difficulty coming to terms with the end of their relationship. Appellant admitted during the call that, at the time of their break-up, he "was begging" AC to "stay" in the relationship and did not want it to end. We therefore find that AC, not Appellant, ended their relationship; that she did not "blackmail" or threaten him to stay in the relationship; and that Appellant did not tell his trial defense counsel that she had.

We furthermore find that, even if the facts as asserted by Appellant about his reasons for disliking AC's friends were true, Appellant's trial defense counsel gave a reasonable explanation for their decision not to present evidence of those reasons that we will not second-guess. Confronting AC or presenting evidence of these reasons would have corroborated AC's testimony that Appellant intended to isolate her from her closest friends. We have reviewed the declarations of Appellant's trial defense counsel and find Appellant made a knowing and voluntary decision not to testify. We find counsel's level of advocacy was at or above the performance ordinarily expected of fallible lawyers. *See Gooch*, 69 M.J. at 362. Appellant's counsel are presumed to be competent and Appellant failed to overcome that presumption. For these reasons, we conclude that Appellant was not denied effective assistance of counsel.

## III. CONCLUSION

The findings of guilt and the sentence are correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c) (2016).

Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court