UNITED STATES, Appellee,

v.

Gary A. REYNOLDS, Commander, U.S. Navy, Appellant.

No. 56,548.
NMCM 86 0386.

U.S. Court of Military Appeals.

Sept. 25, 1989.

For Appellant: *Lieutenant Susan K. Milliken, JAGC, USN* (argued); *Lieutenant Colonel Richard E. Ouellette, USMC.*

For Appellee: *Lieutenant Commander Lawrence W. Muschamp, JAGC, USN* (argued); *Captain Wendell A. Kjos, JAGC, USN* (on brief); *Captain H.C. Lassiter, USMCR.*

*Opinion of the Court*

COX, Judge:

Appellant was convicted of raping his date in his room at the Navy Lodge, Navy Ships Parts Control Center, Mechanics-

burg, Pennsylvania.[1] He first met the prosecutrix in a bar or restaurant, Whispers, in December of 1984. After striking up a conversation, appellant gave her his telephone number and suggested that she call him. Several days later she did, and they arranged a date for a Friday evening. Prior to the date, however, they met informally at a bar to become better acquainted. About 2 hours before the Friday date, the prosecutrix called it off. The reason given was appellant's marital situation.

Approximately a month later, she again saw appellant at Whispers. At the time, she was escorted by another man (a state trooper) and did not talk with appellant; but it prompted her to telephone him again. They made a date for the following Monday, March 4, 1985.

On Monday, she called him at approximately 4:30 p.m. to confirm the date. Later, he picked her up at her house, and they went to Coakley's Town Tavern for drinks and dinner. At approximately 9 p.m., they left Coakley's and went to appellant's room at the Navy Lodge. There, he set up a photographic slide show which included music, and he showed it to her. Immediately afterward, "he jumped on top of" her and had sexual intercourse with her. Approximately 20 minutes later, he had intercourse with her again. Up to this point, appellant and the prosecutrix essentially agree as to these events.

Her version of what transpired is that she resisted appellant by crying and begging him not to force her. She testified that "his personality changed" from being kind and gentle to being very aggressive and abusive. He forcibly removed her underclothing and panty hose, and he pushed up her skirt. He then forcibly removed a tampon and threw it against the wall of the room. He did not remove her blouse or expose her breasts. She further stated that he threatened her with a bar bell.

After he had entered her the second time, he allowed her to clean herself up. He took her home at approximately 10 p.m. At around 11 p.m., she called a girlfriend, an emergency medical technician, and related the incident. The evidence is contradictory as to whether the prosecutrix told her girlfriend that she had been raped or whether the girlfriend persuaded the prosecutrix that she had been raped. Her friend advised her "to not take a shower, not to douche, not wash any of her clothing, and to go to the hospital right away." However, the prosecutrix did not heed this advice. When she went to work the next morning at the State Police office, she did not report the incident.

Instead, she visited a medical doctor for an examination on March 6. The doctor testified that the prosecutrix "was concerned that she may have contracted a venereal disease." The doctor further testified that "she said she had had undesirable intercourse and that she had been involved in a situation and it had gotten out of control." Eventually, on March 10, 1985, the prosecutrix reported the incident to her father, a member of the Pennsylvania State Police.

Appellant, however, described the encounter with the prosecutrix as follows:

We were basically talking in a very intimate manner, talking about how nice a time we were having, how we really enjoyed the fact that we had gotten out that evening, and I basically looked into her eyes and she looked into mine, and I kissed her. We started kissing at that point. We laid back on the floor there, and we continued that. We made love. When we were through, we laid there for a while, and then she got up and she did go into the bathroom after the first act of sexual intercourse.

Responding to a request to "describe this first act of sexual intercourse," appellant replied: "I would say that it was a very,

---

1. Art. 120, Uniform Code of Military Justice, 10 USC § 920. He was sentenced to dismissal, and confinement and forfeiture of $1500 pay per month for 6 months. The convening authority approved the sentence, and the Court of Military Review affirmed in an unpublished opinion on September 25, 1986, and reaffirmed its decision on November 18, 1986.

very tender sort of situation, very tender, very intimate."

When asked if the prosecutrix said or did "anything which would indicate to you a reluctance to take part in this act of sexual intercourse," appellant replied, "Yes." He went on to explain that she had told him, "Gary, nice girls don't do this on the first date." However, according to appellant, after he told her they wouldn't "do anything that you don't want to do," she relaxed back into his arms "and we started kissing again, and then we both got aroused and we did in fact make love."

It is clear from the record that the theory of the defense was that appellant was experienced and successful with women, that he was a romantic, a poet, an amateur "photojournalist," and a "Top Gun" pilot, who would never resort to rape to overcome the will of a woman. Appellant's position was that the prosecutrix actually consented, but if she didn't consent, her conduct certainly led him to believe that she had.

Indeed, one character witness, a fellow pilot and naval officer, described appellant as follows:

> Commander Reynolds is a very, very magnetic personality. He's very sensitive. He's kind of romantic. He is a romantic. His interaction with women has always been one of complete gentleman[ly] behavior.

This witness went on to describe appellant as: "a topnotch professional, ... supported by his selection to be a fleet fighter commander—commanding officer"; "an enthusiastic self-starter and motivator"; "a true motivator and a true performer and a true pro."

The Government was confronted with the following case: Both appellant and the prosecutrix agreed on essentially everything that transpired during their relationship up to the point where the issue became consent or force. The prosecutrix insisted that she was raped; appellant insisted that she consented or did not manifest an objection. The victim was divorced and had initiated the relationship by telephoning ap-

pellant several days after their first meeting. Although she had not given him her telephone number and had broken off an earlier date because of appellant's marital situation, she later reinitiated the relationship. Further, she voluntarily went with appellant to his room at the lodge, watched his slide show, and seemed to be enjoying the moment. Given appellant's reputation with women, and as a naval officer and a "Top Gun," the defense position was that it would be implausible, if not totally out of character, for him to have raped her.

Had the case ended on this note, the chances of a conviction would have been considerably diminished. However, the Government presented the testimony of three other witnesses to overcome this apparent deficit. Two of the witnesses were presented during the Government's case-in-chief and are the subject of this appeal; the third witness was presented on rebuttal, and her testimony is not in issue.

First, MG testified during the Government's case-in-chief that, in February of 1984, she met appellant at a bar in Carlisle, Pennsylvania. She was a civilian employee at the Carlisle Barracks Officer's Club and knew him from the club. She related that he took her to his BOQ room and showed her a slide show, accompanied by music. When it was over, he "started making advances towards me. He leaned over and started kissing me and slipped his hand inside the top of my dress and started fondling me." She resisted him and finally managed to pull away from him. She left the BOQ room and started walking home.

According to MG's testimony, appellant followed her in his silver Porsche and told her to get in the car, that he would drive her home. She got in, and he buckled her seat-belt. About 1 mile down the road, appellant pulled off the road and raped her. This incident led to criminal charges against appellant in the Pennsylvania court at Carlisle; he was ultimately convicted of an indecent assault.

This evidence was offered by the prosecution to show a common scheme, plan, or

design, and to show appellant's intent—in anticipation of the defenses of consent or mistake-of-fact. The military judge allowed the testimony "to show a common scheme, plan, or design." The court reserved, however, "the decision on whether" to admit the testimony "to show intent ... pending completion of the defense case or the issue being raised in some other manner."

When the testimony came into evidence, the judge gave the members the following limiting instruction:

> You may consider the testimony of Mrs. ... [G] only for the limited purpose of its tendency, if any, to prove a plan or design of the accused to achieve sexual intercourse with or without the consent of the other party. You are instructed that you may not conclude from this evidence that the accused is a bad person or has criminal tendencies, and that he, therefore, committed the offense charged.

Ultimately, the judge expanded the purposes for which the evidence could be considered and gave the following instruction to the court members:

> Her testimony may be considered by you for the limited purpose of its tendency, if any, to prove a plan or design of the accused to achieve sexual intercourse with or without the consent of the other party, to prove that the accused intended to achieve sexual intercourse with or without the consent of the other party, and to rebut the contention of the accused, that his participation in the offense charged was the result of mistake of fact, regarding ... [the complainant's] consent.

The second government witness was Dr. Della Grossman, a clinical psychologist with a subspecialty in forensic psychology, who was offered to counter any adverse inferences which might be drawn from the fact that the victim did not immediately report the offense to proper authorities. Dr. Grossman was called for the purpose of explaining rape-victim conduct following a rape and why rape victims might delay reporting rapes to the authorities. She also was permitted to describe to the court members the various psychological phenomena known collectively as rape-trauma syndrome.

The third witness, JS, was called by the Government in rebuttal. Her testimony (not in issue on appeal) was that she had on occasion dated appellant. Once he took her to his bachelor officer quarters at Carlisle Barracks and showed her a slide show. After it was over, he became "physically aggressive" and dragged her into the bedroom. She resisted and, after much effort, succeeded in getting away from him.[2]

Appellant made timely objection to the testimony of these witnesses and now on appeal seeks reversal of his conviction based upon the following two issues granted for review by this Court:

## I

WHETHER THE MILITARY JUDGE ERRED IN ALLOWING ... [MG] TO TESTIFY THAT APPELLANT HAD COMMITTED SIMILAR ACTS OF SEXUAL MISCONDUCT WITH HER, IN VIOLATION OF RULE 404(b), MILITARY RULES OF EVIDENCE.

## II

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY AUTHORIZING THE TESTIMONY OF A PSYCHOLOGIST IN VIOLATION OF RULES 702 AND 403, MILITARY RULES OF EVIDENCE.

Mil.R.Evid. 404(b), Manual for Courts-Martial, United States, 1984, like its Federal counterpart, has been the subject of much litigation. Indeed, enough litigation

2. Admissibility of this evidence was not challenged on appeal, although it is potentially subject to the same objection under Mil.R.Evid. 404(b). In any event, it was properly admitted to show intent, state of mind, and lack of mistake, and to rebut evidence presented by appellant.

has been generated concerning these rules to justify a substantial survey of the cases and statutes dealing with uncharged misconduct. Professor Edward J. Imwinkelried, a leading commentator on evidence, has authored a book, *Uncharged Misconduct Evidence* (1984), which sorts out and collects numerous cases relating to the subject. We have also written often on various applications of the rule. *See United States v. Ferguson*, 28 MJ 104 (CMA 1989); *United States v. Gamble*, 27 MJ 298 (CMA 1988); S. Saltzburg, L. Schinasi, D. Schlueter, *Military Rules of Evidence Manual* (hereafter Saltzburg) 361–64, 369–79 (2d ed. 1986 & 1988 Supp.).

The rule can best be summed up by stating that it is abundantly clear that evidence which is offered simply to prove that an accused is a bad person is not admissible. To be admissible, the evidence must have some independent relevance under Mil.R.Evid. 401 and 402. *United States v. Ferguson, supra* at 108. It must "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Mil.R. Evid. 401. And, of course, "its probative value" must not be "substantially outweighed by the danger of unfair prejudice." Mil.R.Evid. 403.

Therefore, when we look to evidence of uncharged *misconduct*, we are testing its admissibility under at least three standards:

1. Does the evidence reasonably support a finding by the court members that appellant committed prior crimes, wrongs or acts? *United States v. Mirandes–Gonzalez*, 26 MJ 411 (CMA 1988).

2. What "fact ... of consequence" is made "more" or "less probable" by the existence of this evidence? Mil.R.Evid. 401; *United States v. Ferguson, supra* at 108.

3. Is the "probative value ... substantially outweighed by the danger of unfair prejudice"? Mil.R.Evid. 403; Saltzburg, *supra* at 362.

*See United States v. Hicks*, 24 MJ 3, 7 (CMA), *cert. denied*, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 55 (1987). If the evidence fails to meet any one of these three standards, it is inadmissible.

Testing MG's testimony against these standards, we conclude that it was relevant and probative, and that the "probative value" was not "outweighed by" any "danger of unfair prejudice."

First, there is little controversy that uncharged misconduct against MG occurred. Its existence was supported not only by the testimony of the witness, but also by appellant's conviction in the criminal court of Pennsylvania.

Second, the key "fact[s] ... of consequence" in the instant case were (1) whether the prosecutrix consented or, if not, (2) whether appellant had reason to believe she had and, hence, was reasonably mistaken as to her consent. Mindful that the defense portrayed appellant as a kind, romantic, poetic lover, who would never resort to force to satisfy his lust, the Government offered the prior acts to show that his object in inviting the prosecutrix to the room and presenting the slide show was to have intercourse with or without her consent.

Confronted with this classic consent/mistake-of-fact defense, evidence that appellant used the very same method to accomplish his sordid purposes on other occasions was extremely probative of a predatory *mens rea* on the night in question. Likewise, it strongly countered the fall-back position of mistake-of-fact.

Lastly, while the evidence was highly prejudicial to appellant's *liberty* interests, as is most good prosecution evidence, we are satisfied that its legitimate probative value far outweighed any residual "unfair prejudice," given the unique facts of the case and their striking similarity to the other two incidents presented by the Government.

We are mindful that we have held elsewhere that *modus operandi* evidence is not generally admissible to show lack of

consent. *United States v. Gamble, supra.* Normally, *modus operandi* evidence enjoys logical relevance only to prove identity. *United States v. Rappaport,* 22 MJ 445 (CMA 1986). However, if the prior acts of appellant are significantly similar to the charged acts and thus evidence a *particular* "design" or "system," and are *relevant to prove or disprove a fact in issue,* the uncharged conduct may be admitted to prove such a design or purpose. II Wigmore, *Evidence* § 304 (Chadbourn rev. 1979); *United States v. Brannan,* 18 MJ 181 (CMA 1984).

The question of whether particular acts are admissible turns upon the issue in controversy. One authority states:

> In many cases intent will be an element of the government's case, but the kind of act that the accused committed is almost always an intentional act. In such a case, *it is wise for the court to decline to admit evidence of other acts to prove intent until the defendant has an opportunity to put on evidence.* If the defendant challenges intent, then on *rebuttal the prosecution can offer the evidence of the other acts.* Where intent is more clearly an issue in a case, evidence of other crimes need not be held in reserve.

*Saltzburg, supra* at 362 (emphasis added; citations omitted).

Here, there was no issue of appellant's identity or whether he performed the alleged acts. The only issue was his *mens rea* or criminal intent. Was it appellant's intent to have consensual sexual intercourse and *only* consensual sex, or was it his intent to have sexual intercourse with or without consent? His significantly similar conduct evidencing his "design" or "scheme" or "system" leading to non-consensual intercourse was highly probative of his intent. The logical inference to be drawn from his similar acts was that he had worked out a system to put his victim into an unsuspecting and vulnerable position whereby he could engage in sexual intercourse with or without consent. Thus,

the prior similar acts were admissible under the unusual facts of this case.

■ We need not decide whether it was error for the Government to have introduced the prior acts in its case-in-chief. We agree with the commentators that this type of evidence should not be admitted until the issue is clearly in controversy. The rationale is simple. It is impossible to weigh the unfair prejudice against the probative value of the 404(b) evidence until the fact in controversy becomes clear. For example, if the accused denies the criminal act, evidence which proves his intent is not the issue. If, on the other hand, he admits the act but asserts a non-criminal intent, then his intent is relevant. According to Professor Wigmore:

> In a number of rulings involving these principles, the question has been raised whether it is proper to introduce the evidence of other offenses during the prosecution's case in chief. The argument against doing so is that if the accused's evidence should deny the doing of the act, then no issue of intent would arise; hence the evidence of former offenses could only prejudice the accused, unless it involved motive or design.

Wigmore, *supra* § 307 at 262–63 (footnote omitted). *See also* Imwinkelreid, *supra* at Chapter 5.

■ In the case *sub judice,* we are satisfied that appellant clearly placed his intent, scheme, or design into evidence from the outset of the case. Indeed, appellant's criminal intent or lack thereof was the determinative issue. We are further convinced that the military judge correctly analyzed the evidence and the purpose for which it was offered. He properly weighed the probative value against any unfair prejudice, and he carefully instructed the members concerning the limitations on use of the evidence. Considering the unique facts of this case, we will not overturn his ruling on appeal. However, we caution bench and bar that this case does not expand or change the considerably limited use of prior sexual misconduct to prove a sexual-misconduct case. *See United States v. Fergu-*

son, *United States v. Gamble, United States v. Rappaport*, all *supra.* In order to be admissible, the evidence must prove some issue in controversy, and it must be carefully balanced to insure that "its probative value" is not "substantially outweighed by the danger of unfair prejudice." Mil.R.Evid. 403.

■ Turning to the testimony of Dr. Grossman, the plain rule of law is that an expert's testimony concerning "rape-trauma syndrome ... is probative within the meaning of Mil.R.Evid. 401 and 402 on the issue of consent by the victim." *United States v. Carter*, 26 MJ 428, 429 (CMA 1988). This is subject to the limitation, of course, that the expert cannot "opine as to the credibility or believability of" the victim. *See United States v. Arruza*, 26 MJ 234, 237 (CMA 1988), and the cases cited therein, and at 239 (Sullivan, J., concurring in the result), *cert. denied,* —— U.S. ——, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989).

We have scrutinized the testimony of Dr. Grossman and conclude that it was admissible under these rules. There is no error prejudicial to the substantial rights of appellant.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge EVERETT and Judge SULLIVAN concur.