# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40211**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Tyler J. WILLIAMSON**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 22 May 2023

————————————

*Military Judge:* Colin P. Eichenberger (arraignment); Brett A. Landry.

*Sentence:* Sentence adjudged on 29 July 2021 by GCM convened at Hill Air Force Base, Utah. Sentence entered by military judge on 19 October 2021: Dishonorable discharge, confinement for 37 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand.

*For Appellant:* Major Matthew L. Blyth, USAF; Jonathan W. Crisp, Esquire.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Major John P. Patera, USAF; Captain Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and CADOTTE, *Appellate Military Judges*.

Senior Judge POSCH delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge CADOTTE joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

POSCH, Senior Judge:

Contrary to his pleas, Appellant was convicted by a military judge at a general court-martial of one specification of sexual assault of JT, one specification of aggravated assault by inflicting substantial bodily harm upon JT, one specification each of assault consummated by battery upon JT and a different woman, SW, and one specification of animal abuse, in violation of Articles 120, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 928, 934.[1,2] The military judge sentenced Appellant to a dishonorable discharge, confinement for 37 months, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand.

On appeal, Appellant asks whether (1) the military judge abused his discretion in denying Appellant's pretrial motion to exclude Mil. R. Evid. 404(b) matters from consideration by the trier of fact; (2) the findings of guilty are factually insufficient as to his conviction for sexual assault of JT; (3) the findings of guilty are factually insufficient as to his conviction for animal abuse; (4) the findings of guilty for aggravated assault of JT and for the assaults consummated by battery upon SW and JT are factually insufficient, and all five convictions are legally insufficient; (5) the military judge abused his discretion by limiting the amount of time available for the court-martial because of a scheduling conflict the following week; (6) trial defense counsel provided ineffective assistance by failing to call witnesses, introduce evidence, rebut evidence, and heed Appellant's key decisions in the court-martial; (7) Appellant's sentence is inappropriately severe; and (8) the omission from the record of trial of the arraignment audio is substantial and warrants relief.[3]

---

[1] In this sentence, references to sexual assault, aggravated assault, and animal abuse are to offenses described in the *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*); and reference to assault consummated by battery is to the offense described in the *Manual for Courts-Martial, United States* (2016 ed.). Except where noted in this opinion, all other references to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence (Mil. R. Evid.) are to the 2019 *MCM*.

[2] Appellant was acquitted of two specifications alleging rape by using unlawful force in violation of Article 120, UCMJ, *Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*). Appellant was also acquitted of one specification of sexual assault; three specifications of assault consummated by battery; one specification of obstructing justice; and one specifications of animal abuse.

[3] Appellant personally raises issues (4) through (8) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). With regard to issue (8), on 1 March 2023, we granted, without opposition, Appellee's motion to attach an audio recording of the arraignment along with a declaration attesting to its authenticity.

We have considered issues (2) through (8) and find none requires discussion or warrants relief.[4] *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). In this opinion we discuss the first assignment of error and find no error materially prejudicial to Appellant's substantial rights. Concluding that the findings of guilty and sentence are correct in law and fact, and should be approved, we affirm the findings and sentence.

## I. BACKGROUND

Appellant alleges error in the military judge's application of Mil. R. Evid. 404(b) and 403. He contends he was wrongfully convicted of sexual assault as a result. He claims that evidence of his abusive behavior toward JT, including evidence that was admitted with regard to Specifications 3 through 6 of Charge II (Article 128, UCMJ),[5] was inadmissible to show that he committed the sexual assault alleged in Specification 4 of Charge I (Article 120, UCMJ). In our consideration of this issue, we evaluated evidence of Appellant's conduct toward JT, including the factual underpinnings of the charged incidents of physical abuse. We summarize that evidence here along with the evidence supporting Appellant's conviction for sexual assault.

JT was the first witness called to testify at Appellant's trial. She and Appellant met in March 2018. In August 2018 she moved to Roy, Utah, and began living with Appellant in an apartment near Hill Air Force Base, Utah. They had a "good" relationship until it took a turn for the worse. In time, Appellant would make derogatory comments about JT's appearance, telling her she "presented [her]self as a wh[*]re." He was "always" angry when she spent time with friends. Appellant told her he "didn't trust any of [her] female friends" and thought her male friends "just wanted to sleep" with her, believing "that[ was] the only reason" the males would talk to her. If JT wanted someone to visit their home Appellant "had to approve who it was," but "he never approved anyone coming over." When she was away from home, Appellant made her check in with him before spending time with friends. During a three-day trip to Las Vegas, Nevada, for training, and while away from home on the first night, JT

---

[4] Although not raised by Appellant, we considered the fact that Prosecution Exhibit 9 is missing from the record. In its place is a duplicate of a different exhibit. We conclude relief is not warranted because the missing exhibit relates to a specification of animal abuse of which Appellant was acquitted, and the evidence that was admitted to prove that specification has no bearing on any issue before the court.

[5] Specifications 3 through 6 of Charge II allege offenses committed upon JT. Appellant was found guilty of Specification 3 of Charge II for assault consummated by battery, and guilty, by exceptions, of Specification 6 of Charge II for aggravated assault by inflicting substantial bodily harm. Appellant was acquitted of assault consummated by battery in Specifications 4 and 5 of Charge II.

received numerous "missed calls, [and] texts" from Appellant. Appellant was "really upset" that she went out as a group and he called JT's mother to complain about JT spending time with male coworkers.

JT testified about incidents with Appellant that happened two to three years before trial. In her telling, "[t]here were times after things would get physical between [them]" and she "would leave" and go "to a friend's house who lived nearby." "[M]ultiple times" she would pack her belongings in her car and drive away, but she "didn't really have anywhere to go." She lacked money to put down a security deposit on an apartment and had two dogs she "didn't want to leave . . . behind." On cross-examination by Defense, JT volunteered she "d[id]n't recall specific dates for a lot of th[o]se events." When discussing the incidents with special agents of the Air Force Office of Special Investigations (AFOSI) about a year before her trial testimony, she "gave estimates of the months that every situation occurred to the best of [her] knowledge."

Appellant introduced a written statement JT gave to the police during an interview after the last charged incident of assault. JT authenticated that statement and her signature, and the exhibit was admitted without limitation. In that statement she described incidents of Appellant's conduct, including some that went beyond misconduct charged by the Government. For example, she described how Appellant "ha[d] shoved [her] previously, throw[n a] phone at the wall multiple times causing holes, punched [a] wall, broke [a] table, punched [a] hole in [a] door, threw [a] fan through [a] door, shoved his mother[, and] mentally abused [JT] by talking down to [her] and degrading [her]." On redirect examination she acknowledged that Appellant shoved and grabbed her multiple times during their relationship.

## A. Assault in South Carolina Conviction (Specification 3 of Charge II)

JT testified about the first instance of physical abuse that occurred in September 2018. Appellant was performing temporary duty in South Carolina when she visited and stayed with him in a hotel. On the day she arrived, the two began to argue outside the hotel when JT noticed a picture of Appellant's ex-wife on his phone. JT admitted pushing Appellant during this argument. In JT's telling, she "shoved [Appellant] outside, [they] calmed down a little bit, went up to the room, and that's where things got physical."

JT recalled how Appellant "pushed [her] on the ground and then . . . when [she] got up, he threw [her] onto the bed and kind of held [her] down while [she] was on the bed." She recalled "[a]sking him to stop" as she lay on her back with him on top of her. After Appellant stepped away and she got off the bed, they argued. JT told Appellant she wanted to leave and he then threw her car keys in her direction, hitting a chair. Appellant "said that he wasn't trying to hit [her], that he has good aim, [and] that if he wanted to hit [her], he would have."

JT did not leave the hotel after the incident. Appellant's conduct in the hotel room was the basis for his conviction for assault consummated by battery by shoving JT's body with his hand as alleged in Specification 3 of Charge II.

## B. Assault in Utah Allegations (Specifications 4–5 of Charge II)

### 1. Conduct Alleged in Specification 4 of Charge II

JT testified about Appellant's abusive behavior when they lived in Roy, Utah, between December 2018 and July 2019. JT recalled "there was a time that [Appellant] shoved [her] up against the doorframe to the laundry room and he held [her] there . . . . [with] his hand around [her] neck." Her "breathing was restricted" and "it was hard to swallow." Trial counsel asked JT what she was thinking about when Appellant held her against the doorframe. She answered she "was afraid" and "scared of like standing up for [her]self and making [Appellant] more upset. [She] was scared that he was going to choke [her] harder." When he let go, "he was yelling at" her as he followed her to their bedroom. After she turned to face Appellant, he shoved her onto the bed. JT described falling "back onto the bed." During the incident, Appellant "punched [her] and he kind of stepped back a little." When he came toward her again, she stuck out her leg to "keep him away from [her], and [her] foot hit his stomach," which ended the physical conflict. On cross-examination, JT acknowledged she could not remember the month, much less the week, when the incident occurred; however, she "would guess March or April" 2019.

JT testified in general terms about verbal arguments they had, including that Appellant would "throw" and "break" things, which as noted earlier, went beyond the charged incidents of misconduct. In her telling, "the first time it actually got physical was maybe March 2019." Three more times during her direct examination JT offered that she was uncertain if the incident she went on to describe was the first incident involving Appellant in Roy, Utah.

Appellant was found not guilty of unlawfully grabbing JT, an intimate partner, on the neck with his hand between on or about 1 January 2019 and on or about 30 June 2019, as charged in Specification 4 of Charge II.

### 2. Conduct Alleged in Specification 5 of Charge II

JT described a second incident in July 2019 toward the end of her relationship with Appellant. Sometime in June or early July, Appellant hurt his foot. Although Appellant was given crutches, he rarely used them to walk.[6] The

---

[6] During follow-up questioning by trial counsel about how Appellant was able to walk without crutches, JT explained he walked "[r]eally well. He maybe kind of hobbled a little bit, but . . . there were times that he was going after [her] around the house, around the apartment. So he could still move pretty quickly."

night before this second incident JT "want[ed] to sleep in [their] bed" so she laid down in their bedroom. Appellant "walked into the room and said, 'This is my bed. If you want to sleep here, you have to have sex with me.'" JT left and went to the room where Appellant's son would sleep when he visited. After JT locked the door, Appellant stood outside of the door, calling her "b[*]tch," "wh[*]re," and saying other "really hurtful" words. JT "didn't say anything back;" she "tried to ignore him" and sleep. "Eventually, he got tired of [her] not responding and he left."

The next morning JT and Appellant walked past each other in the upstairs hallway. He asked JT if she would give him a ride to work, and she declined because of how he spoke to her the previous night. In JT's telling, Appellant "gave [her] this evil look and he shoved [her] into the wall" as they "were standing right outside of the bathroom." Later, she testified, "I think he shoved me -- I don't remember for certain, but I think he shoved me with his hands on my right side." As she walked downstairs Appellant "threw one of his crutches" at her. On cross-examination, JT stated she "d[id]n't remember" if this second incident "was July or June," but "[t]here were multiple times that he shoved" her. During questioning by the military judge, JT likewise could not recall if the incident occurred in June or July. She testified, "My guess would be it was, like, June, but I'm not certain."

Appellant was found not guilty of unlawfully shoving JT, an intimate partner, against a wall with his hand between on or about 1 July 2019 and on or about 28 July 2019, as charged in Specification 5 of Charge II.

## C. Aggravated Assault in Utah Conviction (Specification 6 of Charge II)

JT described a third incident at the end of July after the incident with the crutches. She believed this third incident occurred later the same day as the second incident, possibly on 29 July 2019. She explained that in the few days before the incident they had been arguing. The argument related to a text message JT received from Appellant's ex-wife and the mother of his son, which revealed a recent sexual encounter between Appellant and his ex-wife. JT was upset by the text and that night she asked Appellant to show her text messages he had with his ex-wife "just to show [her] that nothing happened between them." JT picked up Appellant's phone where he set it on the kitchen counter. When Appellant saw she had his phone, "he came at [her] and he shoved [her] against the wall." On cross-examination, JT testified with greater certainty that this third incident occurred on the night of 29 July 2019, and that of the "multiple times" when Appellant had shoved her, this one was "the one [she] remember[ed] most." On cross-examination she also acknowledged an interview with police in which she stated that she grabbed Appellant's phone and "that's when he came at" her, although "[h]e didn't shove [her] or anything."

On direct examination JT described how Appellant held her against a wall with his hand or arm either across her chest or at the base of her neck, although he was not trying to choke her. The Government introduced the transcript of the police interview in which JT states Appellant "just kind of held [her] against the wall to get his phone back." JT testified she "shoved him to get him away from [her]," then Appellant "came at [her] again and he grabbed [her] head." He then "pushed [her] down to the ground." In her telling, Appellant "started punching [her] in the head, and he punched [her] in the ribs, on [her] arm, and it felt like he kicked [her]. [She] couldn't really see what was going on, but it felt like he kicked [her]." She believed she was kicked "[b]ecause it felt different than when he punched [her]. [She] didn't see his foot, but it didn't feel the same" as when he punched her with a fist.

JT testified how Appellant "sat down and was just staring at [her]" as she lay on the floor crying. Her face felt "really swollen," she felt a huge bump on her cheek, and was in pain. JT got up to go to the bathroom and locked the door. She saw her face was "really swollen" and she had a black eye. She took pictures and sent them to a manager where she worked. When she spoke to Appellant, explaining she "needed to go to the [emergency room] to make sure that [she] was okay," she "noticed that [her] hearing wasn't right. It sounded really muffled. It sounded like, almost like [she] was under water." At trial she explained "when [she] yawned it . . . sounded like air coming out of [her] ear."

At one point when JT was preparing to leave to go to an emergency room, Appellant grabbed her keys and threw them at her, hitting the oven. Appellant repeatedly asked what she was going to tell the medical providers about the cause of her injuries. In JT's telling,

> He kept saying, "You think you're so strong. You think you're such a tough woman, but you're scared of me now, aren't you?" And he kept like lurching forward at me as if he was going to hit me again. He followed me upstairs like that. He followed me back down the stairs like that. And he just kept making those comments. Kept lurching forward at me like as if he was going to hit me. He kept like laughing, thinking it was funny that I was scared. And he told me that if he got arrested for what he did, that he would kill me and kill everyone that I loved.[7]

The following day, at the urging of her manager, JT sought medical evaluation and treatment. At trial, the bruises were corroborated by photographs JT

---

[7] Appellant was found not guilty of obstruction of justice by uttering words to this effect "with intent to impede the due administration of justice in the case of himself, against whom he had reason to believe there would be criminal proceedings pending," as charged in the Specification of Charge III.

took of her face and the testimony of her manager who saw the pictures and observed her at work the morning after the incident. Additionally, the manager testified that JT asked him to hold onto the pictures "because she was worried that her current boyfriend at the time would go through her phone and delete [them]." A nurse practitioner who treated JT testified she observed bruising on JT's left eyelid, which was consistent with a medical record admitted into evidence. The nurse documented a tympanic membrane perforation she observed inside JT's left ear, which the nurse explained in her testimony "mean[t] that there was a hole in the left eardrum."

Appellant's conduct was the basis for his conviction for aggravated assault by striking JT, an intimate partner, on the head with his hand, and thereby inflicting substantial bodily harm upon her, to wit: a ruptured ear drum on or about 30 July 2019, as alleged in Specification 6 of Charge II. The military judge found Appellant guilty of this offense after excepting the words, "and kicking her back with his foot," from the finding of guilty. Appellant was found not guilty of the excepted words.

## D. Sexual Assault Conviction (Specification 4 of Charge I)

JT testified that Appellant sexually assaulted her a day or two after the aggravated assault that ruptured her eardrum. Appellant entered the bedroom as she lay in bed on her stomach. Appellant lay down on top of her. Appellant tried to hug and kiss her as she told him to get off and that she "just wanted to be alone. That [she] needed space." JT explained what happened next:

> A [JT]. I keep asking him to stop. I'm not kissing him back. I'm not showing affection. I just kept asking him to stop, to leave me alone.
>
> Q [Trial Counsel]. Did he stop?
>
> A. No, he did not.
>
> Q. Okay. What did he do?
>
> A. He -- I remember he took off my shorts. I don't remember if he took off my underwear or not. And he put his penis . . . in my vagina. He -- I was on my stomach and he was on top of me.
>
> Q. Okay. What was going through your mind while he was doing that?
>
> A. I was really scared. And I didn't want him to hit me again. I didn't want to make him mad. I felt like he -- I felt like he took away my freedom to choose who I give myself to. I just remember being scared. Scared of not giving him what he wanted, or not letting him have what he wanted.

> Q. Did you want to have sex with him?
>
> A. No.
>
> Q. And before he started, you told him "No"?
>
> A. Yes.

At one point, JT relayed that Appellant remarked, "This is the only beating I should do," which prompted JT to start crying. Appellant stopped after JT told him she had to go to the bathroom. When she returned, Appellant was sitting on the couch and asked, "That's it? We're not going to finish?" JT "just said, 'No.'"

On cross-examination JT maintained she told Appellant "no" and "stop." When she returned from the bathroom Appellant did not reinitiate sexual activity. She also acknowledged the first time she reported the sexual assault was more than a year later when she was interviewed by special agents of the AFOSI. She did not mention the incident until a second interview with AFOSI agents. Appellant's conduct in their bedroom was the basis for his conviction for sexual assault of JT by penetrating her vulva with his penis without her consent, as alleged in Specification 4 of Charge I.

After the sexual assault, sometime at the end of July or the beginning of August 2019, JT moved out of the residence. After moving out and making a statement to police, she sent Appellant messages about how much she loved him and how she wanted to marry him one day. She also texted him,

> I think if we live together, that will just delay us from getting us to where we want to be. That is the biggest reason why I left. Not because I don't want to be with you. Not because I'm afraid of you. But because that is what honestly I think will save our relationship.

JT testified she sent the message, telling Appellant what she "thought he wanted to hear."

## II. DISCUSSION

In his first assignment of error, Appellant urges us to set aside his conviction for sexually assaulting JT on grounds that the military judge who presided at trial erred by denying his pretrial motion and therefore abused his discretion. We conclude that the military judge did not abuse his discretion.

### A. Additional Background

Before trial, the Government provided written notice to Appellant of its intent to show Appellant's criminality using several Mil. R. Evid. 404(b) matters. It cited Mil. R. Evid. 404(b)(2) as the basis to use those matters "for a non-

propensity purpose." *See* Mil. R. Evid. 404(a)(1). Although the notice cast a wide net, as relevant to Appellant's conviction for sexual assault of JT, the Government explained the non-propensity purposes for three matters like this:

- First, "[t]he [P]rosecution intends to argue that the charged incidents of physical abuse demonstrate[ ] a pattern of behavior, that continued to escalate . . . ."[8]

- Second, "[d]uring the course of their relationship, [Appellant] was mentally and emotionally abusive to [JT], to include calling her names and restricting her ability to interact with other people. The [P]rosecution intends to offer this evidence as proof of [Appellant]'s intent, pattern of behavior, and modus operandi."

- Third, "[d]uring their relationship, in approximately July 2019, [Appellant] called [JT] a 'b[*]tch' and a 'wh[*]re' before throwing a walking crutch in the direction of [JT]. The [P]rosecution intends to offer this evidence as proof of [Appellant]'s intent and pattern of behavior."

Appellant disputed the relevance of these matters by filing a motion to exclude their consideration by the trier of fact. On appeal, he maintains that the conduct noticed by the Government, which was subsequently admitted as evidence, allowed "damaging bad-character evidence . . . without legal purpose."

With respect to the first Mil. R. Evid. 404(b) matter raised by the Government, "the charged incidents of physical abuse" of JT related to the four specifications under Charge II. Those specifications alleged violations of Article 128, UCMJ, as discussed above. It bears repeating that the Government accused Appellant of using his hand to shove JT's body and, in a separate incident, striking her on the head and hand, and kicking her back with his foot, thereby causing a ruptured ear drum.[9] The Government also accused Appellant of grabbing JT on the neck with his hand and shoving her against a wall with his

---

[8] The Prosecution's notice encompassed all "charged incidents of physical abuse," claiming they showed a pattern that escalated "from each romantic relationship" involving Appellant and other victims. To the extent the notice reached incidents that involved victims other than JT, the military judge ruled that the Prosecution failed to show "what non-propensity purpose would be served by allowing trial counsel to argue that an exception exists from the normal prohibition against spillover." Accordingly, with regard to the first noticed Mil. R. Evid. 404(b) matter, the focus of our opinion is evidence of physical abuse of JT, notably, evidence of various assaults upon her.

[9] As discussed, *supra*, the Government charged this conduct in Specifications 3 and 6 of Charge II, which alleged assault consummated by battery and aggravated assault, respectively. Appellant was found guilty of Specification 3; and guilty of Specification 6, except the words, "and kicking her back with his foot."

hand.[10] In its opposition to the Defense's motion, the Government explained the evidence would show that Appellant's abusive "behavior would precede nonconsensual intercourse" and therefore was relevant on the issue of consent to the charged sexual assault.

The military judge heard argument on the motion in an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session. Appellant argued the three noticed matters showed criminal propensity, and were not permitted under Mil. R. Evid. 404(b) as a result. Appellant argued, moreover, that any probative value was substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403.

**B. Ruling**

The military judge ruled on the motion in an email he sent to counsel for both parties before trial. He finalized that ruling in a written decision after the Prosecution completed offering evidence at trial on the offenses of which JT was a named victim.

In the email, the military judge stated his finding,

> [T]he Government may argue that [Appellant] engaged in a pattern of behavior relating to physical abuse and control of [JT] as it pertains to the elements of consent and bodily harm and the defense of mistake of fact related to other specifications in Charges I and II involving [JT] as the named victim. In other words, the Government is permitted to argue the relevance of past interactions between [JT] and [Appellant] to the extent they might impact the states of mind of [JT] and [Appellant] related to those elements.

The military judge further found that the Government met its burden to introduce evidence demonstrating that Appellant "may have acted with a plan or intent to control [JT] as that relates to his commission of the charged offenses in which she is the named victim."

In his written ruling, the military judge concluded that the Prosecution presented sufficient evidence to reasonably support a finding that Appellant engaged in the conduct at issue. With regard to the noticed matters, he found

---

[10] As discussed, *supra*, the Government charged this conduct as assault consummated by battery (Specifications 4 and 5 of Charge II). Appellant was acquitted of Specifications 4 and 5.

the evidence tended to show Appellant engaged in "behaviors . . . that can generally be characterized as 'controlling' in nature."[11] The military judge then applied legal principles underlying Mil. R. Evid. 404(b) to that evidence.

With respect to the first Mil. R. Evid. 404(b) matter—the conduct underlying incidents of physical abuse of JT that the Government alleged in the four specifications of Charge II—the military judge ruled that "[t]o the extent that these interactions show a pattern of behavior or design related to abuse and control of [JT], trial counsel may argue the relevance of these incidents" on its burden of proof. The military judge permitted their use in three ways: (1) on the question of JT's "consent;" (2) "whether a touching was offensive so as to constitute bodily harm;" and (3) whether "defenses such as mistake of fact" were raised by the evidence and disproven by the Government. Applying Mil. R. Evid. 403, the military judge found "the probative value of this evidence [wa]s not substantially outweighed by the danger of unfair prejudice that might occur by evaluating its impact on various specifications, particularly in a military judge alone forum."

With respect to the second and third Mil. R. Evid. 404(b) noticed matters, the military judge likewise found the Government had shown non-propensity purposes. He concluded that those matters

> may be admitted as evidence [of Appellant]'s pattern of behavior, intent and absence of mistake of fact. As these behaviors inform the overall nature of the relationship between [Appellant] and [JT], the effect of these behaviors on the state of mind of both is relevant for multiple valid, non-propensity or character related purposes such as the [c]ourt's consideration of the element of consent in regard to the charged sexual assaults.

Applying Mil. R. Evid. 403, the military judge stated that the probative value was not substantially outweighed by the danger of unfair prejudice.

## C. Law

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act by a person is not admissible as evidence of the person's character in order to show the person acted in conformity with that character on a particular occasion, and cannot be used to show predisposition toward crime or criminal character. However, such evidence may be admissible for another purpose, including to show motive, intent, plan, absence of mistake, or lack of accident. Mil.

---

[11] However, the military judge identified a different alleged victim in this paragraph of his ruling, using AR's initials instead of JT's. The weight of evidence indicates that the military judge intended to refer to JT in this part of his analysis. Counsel for both parties seem to concede this was a scrivener's error, as finds this court.

R. Evid. 404(b)(2); *United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010) (citation and footnote omitted). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989) (footnote omitted).

The rule, "like its federal rule counterpart, is one of inclusion." *United States v. Tanksley*, 54 M.J. 169, 175 (C.A.A.F. 2000) (citing 1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 2:31 at 163 (1999)), *overruled in part on other grounds by United States v. Inong*, 58 M.J. 460, 465 (C.A.A.F. 2003). The rule "does not say whether the 'other crimes, wrongs, or acts' must be charged or uncharged conduct." *Id.* (quoting Mil. R. Evid. 404(b), *Manual for Courts-Martial, United States* (1998 ed.)). The factual underpinnings of one specification may be used by the trier of fact as proof of a different offense. *Id.* (observing "a pattern of lustful intent, established in one set of specifications, could be used by factfinders as proof of lustful intent in a different set of specifications" (citations omitted)). However, "evidence that an accused committed one offense is not admissible to prove that the accused had the propensity to commit another offense." *United States v. Hyppolite*, 79 M.J. 161, 161 (C.A.A.F. 2019) (citing Mil. R. Evid. 404(b)(1), *Manual for Courts-Martial, United States* (2016 ed.)).

We apply a three-part test to review the admissibility of evidence offered under Mil. R. Evid. 404(b): (1) Does the evidence reasonably support a finding by the factfinder that Appellant committed other crimes, wrongs, or acts? (2) Does the evidence of the other act make a fact of consequence to the instant offense more or less probable? and (3) Is the probative value of the evidence of the other act substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403? *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989) (citations omitted). "If the evidence fails to meet any one of these three standards, it is inadmissible." *Id.*

A military judge's ruling under Mil. R. Evid. 404(b) and Mil. R. Evid. 403 will not be disturbed except for a clear abuse of discretion. *United States v. Morrison*, 52 M.J. 117, 122 (C.A.A.F. 1999) (citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) . . . incorrect legal principles [are] used; or (3). . . his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008) (per curiam)).

## D. Analysis

The gravamen of Appellant's challenge to the evidentiary rulings is that the analysis therein was faulty and insufficient. Appellant claims it was error

to allow evidence of his abusive treatment of JT, including evidence offered to prove the offenses alleged in Specifications 3 through 6 of Charge II, to show that he committed the sexual assault alleged in Specification 4 of Charge I. We conclude that the military judge did not abuse his discretion.

To understand Appellant's claim, we briefly turn to evidence the Government admitted to prove a specification of which Appellant was acquitted: rape of a different alleged victim (AR) by using unlawful force in violation of Article 120, UCMJ, *Manual for Courts-Martial, United States* (2012 ed.). Before trial, the Prosecution noticed Appellant's acts of controlling and abusive behavior toward AR that it wanted to use for a stated non-propensity purpose under Mil. R. Evid. 404(b). Over Appellant's objection, the military judge found those acts met safeguards for admissibility and allowed the evidence to prove that Appellant raped AR. As explained next, Appellant contends that the military judge's evaluation of the Mil. R. Evid. 404(b) evidence involving AR was faulty, and so "corrupted his analysis [of] the evidence involving JT."

In Appellant's view, the military judge "seemed to merely cut and paste[ ] the analysis he used regarding AR" in his written ruling, even referring to "AR" by mistake in his analysis of acts involving JT. Appellant contends that the military judge's mistake in referring to AR when he meant JT illustrates he "provided no independent analysis of the facts as they pertained to JT," and "leaves one questioning whether the analysis was actually conducted." Appellant maintains that ruling tainted the military judge's application of Mil. R. Evid. 404(b) to acts on which the Government relied to prove that Appellant committed a sexual assault of JT.

We appreciate Appellant's concern. At the same time, we decline to liken a scrivener's error to flawed judgment. The military judge prefaced his written ruling with the proviso that it was based on "the written submissions" of counsel and "information provided during the motions hearing." Later, he allowed "[n]o evidence has been offered to indicate [JT]'s[12] testimony at trial would be different in any significant degree from her summarized statements contained in the Report of Investigation." The military judge preceded his analysis of the second and third Mil. R. Evid. 404(b) matters at issue with headers that identified JT as the subject of analysis beneath those headers. On the whole, we

---

[12] The military judge again identified "AR" by her initials and not JT. We credit Appellant's theory that the military judge duplicated language from elsewhere in his ruling and neglected to change the initials. For two reasons we are confident the military judge was referring to JT's future testimony at trial and not AR's. First, the military judge twice used identical language when he referred to the summarized statements of both victims in the Report of Investigation, each time using AR's initials. Second, the language quoted here from the ruling—using AR's initials—appeared immediately after the military judge summarized JT's pretrial interviews with investigators.

interpret the ruling as deciding how evidence of Appellant's treatment of JT could be used without reliance on evidence of Appellant's abusive treatment of AR, as claimed.

Consistent with our understanding, the military judge's factfinding as regards Appellant's conduct with JT, and his analysis of those facts in his ruling, were articulated with sufficient precision that we can perform our appellate function in an informed manner. Where a military judge evaluates the same or similar acts as bear on admissibility under a rule of evidence, but in regard to different alleged victims, we do not find cause to question the military judge's analysis even though the language of that analysis may be similar, if not identical, to other analysis in the same ruling. We find that the military judge articulated his ruling as regards JT with sufficient particularity that scrutiny of his ruling as regards AR is not warranted.

We turn, then, to evaluate the military judge's application of the three-part test in *Reynolds*, 29 M.J. at 109, to determine the admissibility of evidence under Mil. R. Evid. 404(b).

### 1. Evidence of Crimes, Wrongs, or Other Acts

With regard to the first *Reynolds* prong—whether the evidence reasonably supports a finding that Appellant engaged in conduct underlying the three noticed matters that involved JT—the military judge did not abuse his discretion in finding that it did. The military judge found that evidence could support a finding that Appellant engaged in instances of abuse that constituted a pattern of controlling behavior.

The military judge's factfinding on the first *Reynolds* prong is supported by the trial record. At times, JT had difficulty recalling when a particular incident of abuse occurred by reference to a date or in relation to other events. However, the trier of fact could conclude that a particular incident occurred during the relevant period even as JT, at times, manifested uncertainty when a particular incident happened.

### 2. Facts of Consequence Made More or Less Probable

We find, also, that the military judge did not abuse his discretion in his application of the second *Reynolds* prong—whether evidence of other acts makes a fact of consequence to the instant offense more or less probable. Consistent with the Government's proffer, the military judge found the incidents at issue were admissible, *inter alia*, as a "pattern of behavior."

Appellant focuses on this finding in his reply brief. He maintains that a pattern of behavior "seems functionally the same as propensity." Nonetheless, we are convinced that the military judge allowed the evidence at issue for a permissible purpose and not for bad character or propensity, as claimed. In

that regard, "a pattern of conduct" that satisfies Mil. R. Evid. 404(b) and "offered for some purpose other than to demonstrate [an] appellant's propensity or predisposition to commit crime" is admissible if logical and legal relevance is shown. *See United States v. Simpson*, 56 M.J. 462, 464 (C.A.A.F. 2002) (allowing trier of fact to consider evidence for the "limited purpose of demonstrating appellant's tendency to take advantage sexually of women who were intoxicated or under the influence of alcohol"); *see also Tanksley*, 54 M.J. at 175 (pattern of lustful intent); *United States v. Johnson*, 49 M.J. 467, 475 (C.A.A.F. 1998) (pattern of sexual abuse); *United States v. Ray*, 26 M.J. 468, 472 (C.M.A. 1988) (pattern of drug abuse).

Put a different way, a pattern of behavior, conduct, or acts in reference to Mil. R. Evid. 404(b) is not synonymous with propensity where there are logical and legal safeguards for admission and use. Among established safeguards is if the trier of fact could find a fact of consequence more or less probable. *See Reynolds*, 29 M.J. at 109 (concluding "evidence that appellant used the very same method to accomplish his sordid purposes on other occasions was extremely probative of a predatory *mens rea* on the night in question"); *see also Simpson*, 56 M.J. at 464 (concluding "evidence was probative of a material issue other than character" (citations omitted)); *Johnson*, 49 M.J. at 474 (concluding the evidence at issue "tend[ed] to make [victim]'s alleged abuse more probable than if the evidence had not been introduced"); *Ray*, 26 M.J. at 472 (allowing "that a pattern of regular drug use can show a knowing drug use on a particular occasion").

Here, the military judge found Appellant's behavior toward JT showed not only a pattern, but that it "inform[ed] the overall nature of the relationship between [Appellant] and [JT]." The military judge concluded that "the effect of these behaviors on the state of mind of both [Appellant and JT] [wa]s relevant for multiple valid, non-propensity or character related purposes such as the [c]ourt's consideration of the element of consent in regard to the charged sexual assaults." On appeal, Appellant challenges this aspect of the ruling as it bears on his sexual assault conviction. As explained next, on this record we are confident that the military judge did not consider evidence of a pattern of behavior as interchangeable with propensity.

Among the facts of consequence for this offense were whether JT consented to vaginal intercourse with Appellant,[13] and whether Appellant mistakenly believed that she had consented.[14] The probative value of the evidence at issue

---

[13] *See* 2019 *MCM*, pt. IV, ¶ 60.b.(2)(d) (listing elements of sexual assault as charged in Specification 4 of Charge I); *see also* 2012 *MCM*, pt. IV, ¶ 45.a.(g)(8) (defining consent)

[14] *See* R.C.M. 916(j)(1) (2019 *MCM* and 2012 *MCM*) (describing defense of ignorance or mistake of fact).

was not unlike two "key" facts of consequence in *Reynolds*: "(1) whether the prosecutrix consented or, if not, (2) whether [the] appellant had reason to believe she had and, hence, was reasonably mistaken as to her consent." 29 M.J. at 109. With respect to sexual assault, "consent" includes "a *freely given* agreement to the conduct at issue by a competent person." 10 U.S.C. § 920(g)(7)(A) (emphasis added). "All the surrounding circumstances are to be considered in determining whether a person gave consent." 10 U.S.C. § 920(g)(7)(C). To refute "mistake of fact" as a defense, the Government had the burden to prove beyond a reasonable doubt that Appellant's ignorance or mistake was not honest or not reasonable "under all the circumstances." R.C.M. 916(b)(1), (j)(1).

The three Mil. R. Evid. 404(b) matters at issue are probative of these facts of consequence. JT testified how she felt insecure to assert herself in the relationship. She feared upsetting Appellant would serve only to escalate conflict and lead to additional and more forceful abuse. She explained her state of mind during the sexual assault in July 2019 after Appellant had recently punched her in the head and ruptured her eardrum: in her telling, she "didn't want him to hit [her] again" or "make him mad." She was "[s]cared of not giving him what he wanted, or not letting him have what he wanted." Trial counsel argued the nexus between the Mil. R. Evid 404(b) matters at issue and the sexual assault by explaining how it followed on the heels of the aggravated assault. Trial counsel argued JT's testimony "provides context to the fact" that Appellant "continuously exerted control over her, making her dependent on him." Trial counsel explained how Appellant used "his physical dominance over her" to achieve that control, and in that context, that the Government had met its burden to prove beyond a reasonable doubt the elements of sexual assault.

We hold that the Mil. R. Evid. 404(b) matters at issue are among the totality of surrounding circumstances that the trier of fact could evaluate: first, to decide whether there was a freely given agreement to the sexual conduct at issue; and second, if Appellant might have misunderstood whether JT had given consent. *See* Mil. R. Evid. 401(a); *United States v. Moore*, 78 M.J. 868, 876 (A.F. Ct. Crim. App. 2019) (holding that evidence of an appellant's controlling behavior was admissible under Mil. R. Evid. 404(b) to show motive, intent, and absence of mistake); *see generally United States v. Jackson*, 2011 CCA LEXIS 303, at *17 (A.F. Ct. Crim. App. 15 Aug. 2011) (unpub. op.) (holding numerous uncharged acts admissible to show appellant's "strong desire to dominate and control women" as motive and plan). The Mil. R. Evid. 404(b) matters at issue made the fact that Appellant may have penetrated JT when she did not consent more probable and Appellant's ignorance or mistake that JT did consent less probable. The military judge did not err in his application of the second *Reynolds* prong.

### 3. Probative Value and Danger of Unfair Prejudice

Applying the third *Reynolds* prong, the military judge found the probative value of the evidence at issue was not substantially outweighed by the danger of unfair prejudice to Appellant under Mil. R. Evid. 403. With regard to the first Mil. R. Evid. 404(b) matter—evidence underlying the charged incidents of abuse of JT that preceded the sexual assault offense—the military judge considered the probative weight "by evaluating its impact on various specifications, particularly in a military judge alone forum." The military judge reached a similar conclusion with regard to evidence of Appellant's mental and emotional abuse of JT, stating "that the probative value of this [Mil. R. Evid. 404(b)] evidence [wa]s not substantially outweighed by the danger of unfair prejudice." We again find that the military judge did not abuse his discretion.

Appellant urges us to perform our own Mil. R. Evid. 403 balancing, arguing "where a military judge fails to place on the record his analysis and application of the law to the facts, little deference should be given." Citing *United States v. Manns*, Appellant contends that the record is indeterminate how the military judge reached his conclusion. 54 M.J. 164, 166 (C.A.A.F. 2000). Appellant contends the military judge did not reveal what his "reasons were for finding that the probative value was not substantially outweighed by the danger of unfair prejudice." Appellant further contends that "[f]ailing to even cite to the factors or the analysis required is cause to question whether the analysis was even conducted."

In *Manns*, the appellant was sentenced by a military judge who admitted contested rebuttal evidence in sentencing. *Id.* On appeal, the United States Court of Appeals for the Armed Forces (CAAF) observed it "gives military judges less deference if they fail to articulate their balancing analysis on the record, and no deference if they fail to conduct the [Mil. R. Evid.] 403 balancing." *Id.* (citing *Gov't of the Virgin Islands v. Archibald*, 987 F.2d 180, 186 (3d Cir. 1993)). Because the military judge in *Manns* did not articulate any Mil. R. Evid. 403 balancing, the CAAF deemed further scrutiny was appropriate, stating that the judges on the court had "examined the record [them]selves." *Id.* (citation omitted).

Appellant asks us to not only examine the record, but urges us to apply our own balancing of logical and legal relevance. He argues that the military judge "merely recited in a talismanic fashion the third prong of the [*Reynolds*] test." As a remedy, he asks us to equate the military judge's failure to provide a detailed analysis under Mil. R. Evid. 403 with situations like *Manns* where no balancing was articulated. However, we do not read *Manns* as Appellant does. Even if *Manns* were analogous to the facts here, in that case the CAAF did not do as Appellant suggests we should by stepping into the shoes of the military judge to decide whether discretionary exclusion of logically relevant evidence

was warranted. In *Manns*, rather, the CAAF examined the record, including the disputed evidence that was at issue in that case, and determined it was "satisfied that the military judge was able to sort through the evidence, weigh it, and give it appropriate weight." *Id.* at 167 (citation omitted). The CAAF's rationale was that "the potential for unfair prejudice was substantially less than it would be in a trial with members." *Id.*

We find no reason to question the application of the military judge's Mil. R. Evid. 403 balancing to the Mil. R. Evid. 404(b) matters as they bear on the facts of consequence that underlie Appellant's sexual assault conviction. Noting the "military judge alone forum" and having evaluated the evidence, it appears neither unfair prejudice nor confusion—nor other Mil. R. Evid. 403 considerations—were a concern to the military judge. Our deferential approach is in line with the CAAF's reasoning in *Tanksley*, which the court decided the same day as *Manns*. In *Tanksley*, the CAAF made enduring observations about the third prong of the *Reynolds* test, remarking it had "said on a number of occasions" that a "military judge enjoys wide discretion when applying Mil. R. Evid. 403." 54 M.J. at 176 (internal quotation marks omitted) (citing *Manns*, 54 M.J. at 166) (additional citation omitted). In the rule's application to Mil. R. Evid. 404(b) matters, the CAAF will "exercise great restraint" and afford "maximum deference" when the military judge has "conducted and announced his Mil. R. Evid. 403 balancing test on the record." *Id.* at 176–77 (citing *Manns*) (additional citations omitted).

A military judge is presumed to know the law and apply it correctly, absent clear evidence to the contrary. *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009) (per curiam) (citing *United States v. Bridges*, 66 M.J. 246, 248 (C.A.A.F. 2008)). The military judge was confident that, as the trier of fact in the judge-alone case, he would use the evidence of Appellant's controlling behavior and pattern of abuse for the limited permissible purposes under Mil. R. Evid. 404(b), and not for general bad character or propensity. In a trial with members there is concern that members will evaluate such limited-purpose evidence "as character evidence and use it to infer that an accused has acted in character, and thus convict." *Staton*, 69 M.J. at 232. However, in a bench trial where the record shows the military judge conducted and announced a Mil. R. Evid. 403 balancing, as was the case here, "if evidence is admitted for a limited purpose, we presume a military judge will consider it only for that purpose." *United States v. Hays*, 62 M.J. 158, 165 (C.A.A.F. 2005) (citations omitted). We are satisfied, as the CAAF was in *Manns*, that the military judge was able to sort through the evidence and give it appropriate weight.

### 4. Conclusion

The military judge did not abuse his discretion by allowing evidence of Appellant's abusive treatment of JT, including evidence admitted with regard to

Specifications 3 through 6 of Charge II, to show that Appellant committed the sexual assault in Specification 4 of Charge I. His findings of fact are supported by the record and not clearly erroneous. Appellant has not shown that the military judge incorrectly applied the law or that his ruling was arbitrary, fanciful, clearly unreasonable, or clearly erroneous. *See United States v. Shields*, ___ M.J. ___, No. 22-0279, 2023 CAAF LEXIS 270, at *9 (C.A.A.F. 28 Apr. 2023) (articulating abuse of discretion standard).

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact,[15] and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[15] The entry of judgment (EoJ), and the Statement of Trial Results that precede the EoJ, state Appellant was found not guilty of the words, "kicking her back with his foot" as charged in Specification 6 of Charge II. In fact, Appellant was found not guilty of the words, "*and* kicking her back with his foot." (Emphasis added). We find no prejudice owing to the omission.